Exhibit 3

AIMSJ0090

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BILLY REYNOLDS AND MARY REYNOLDS | § | |
| | § | C.A. NO. 1:18-cv-00065-MAC |
| V. | § | |
| | § | JURY DEMAND |
| DISH NETWORK | § | AFFIDAVIT SUPPORTING |
| | § | MOTION FOR SUMMARY |
| V. | § | JUDGMENT |
| | § | |
| ASSOCIATED INSTALLATION GROUP, INC. | § | |

## AFFIDAVIT

My name is Danny Parker. I am the owner of Associated Installation Group, Inc. ("Associated").

I am competent to make this affidavit. I have never been convicted of a felony or a crime of moral turpitude. My statements are based on personal knowledge.

I have owned Associated since its formation. I have worked in the satellite dish installation business for 18 years.

Associated installed the Dish Network satellite in a location on the Reynolds' house that permitted alignment with the satellites carrying the Dish Network signals. The Dish satellite system installed at the Reynold's property used, in part, wiring that had been installed by a prior satellite provider, Direct TV, which is a common practice in the satellite installation industry. Associated installed a Dish satellite on the eaves of the Reynolds' house by using a "J" hook. The satellite dish ran to a "splitter" that allowed the satellite signal to be split and serve two receivers on the Reynolds' property. None of the wiring used by Associated to install the satellite system on the Reynolds' property carried an electrical charge. The two receivers installed on the Reynolds' property were new and plugged into a standard 110-volt outlet. Dish supplied the receivers and the satellite dish. The two receivers were plugged in to existing electrical outlets on the Reynolds' property and connected by coaxial cable to existing non-energized satellite TV outlets. Associated simply plugged in the receivers, connected the coaxial cable, aligned the satellite dish, and adjusted the receivers to obtain the satellite signals for the programming ordered for the Reynolds' property.

In 18 years of installing satellite television systems, I have never experienced an explosion from the installation of a satellite system. I have no knowledge of any of the materials and products used in the installation of satellite systems presenting an explosion risk. I have never experienced

a fire risk from the installation materials used to install satellite systems. Associated does not design, manufacture, or prepare the warnings for the satellite equipment it installed at the Reynolds' property. Associated did not modify or alter in any way the equipment it installed at the Reynolds' property or the warnings given with the equipment. Associated supplied the warnings that come with the Dish Network equipment to the Reynolds, when Associated installed the equipment.

I am the custodian or otherwise qualified person of the documents attached to and incorporated in this affidavit. The attached documents are kept by Associated in the regular course of business, and it was the regular course of business of Associated for an employee or representative of BBA, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Signed this _____ day of _____, 2019.


_____
Danny Parker


SWORN TO and SUBSCRIBED before me by Danny Parker on the _____ day of _____, 2019.


_____
Notary Public in and for the
State of Texas

AIMSJ0092

# Exhibit 1

AIMSJ0093

AIMSJ0001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| **BILLY REYNOLDS AND MARY REYNOLDS** | § | |
| | § | **C.A. NO. 1:18-cv-00065-MAC** |
| **V.** | § | |
| | § | **JURY DEMAND** |
| **DISH NETWORK** | § | **AFFIDAVIT SUPPORTING** |
| | § | **MOTION FOR SUMMARY** |
| **V.** | § | **JUDGMENT** |
| | § | |
| **ASSOCIATED INSTALLATION GROUP, INC.** | § | |

## AFFIDAVIT

My name is M. Forest Nelson. I am legal counsel for Third-party defendant Associated Installation Group, Inc. in the captioned action.

I am competent to make this affidavit. I have never been convicted of a felony or a crime of moral turpitude. My statements are based on personal knowledge.

I am the custodian or otherwise qualified person of the documents attached to and incorporated in this affidavit. The attached documents are kept by Burt Barr & Associates, L.L.P. (BBA) in the regular course of business, and it was the regular course of business of BBA for an employee or representative of BBA, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original. The deposition testimony excerpts and deposition exhibit attached to and incorporated in this affidavit came from the deposition of Plaintiff Billy Reynolds, in this case. Billy Reynolds had the opportunity to read and review his deposition transcript. Billy Reynolds filed no errata sheets with the court reporter. The attached excerpts are true and correct copies of the testimony taken in this case. The attached Exhibit 12 is a true and correct copy of the layout of Billy Reynold's house that was drawn and annotated by Billy Reynolds during his deposition in this case.

AIMSJ0094

AIMSJ0002

Affiant says nothing further.

Signed this 25th day of February, 2019.

_____
M. Forest Nelson

SWORN TO and SUBSCRIBED before me by M. Forest Nelson on the 25th day of February, 2019.

_____
Notary Public in and for the
State of Texas



EXHIBIT
WIT:
DATE:
Ada V. Christy, CSR, RPR



XLEER-FAX ⊕ 80000 Series · 30% P.C.W.
www.kleer-fax.com

A PORCH
B Bed Room
C Living Room
D Bed Room
E Kitchen
F DAY Room
G BedRoom

WOODSTOVE
✗

DASHBOX

12×12   12×24   12×12
A       B

12×12           12×    11

12×12   12×12
G       F

1                    CAUSE NO. 14347

2

  BILLY REYNOLDS AND MARY    ) IN THE DISTRICT COURT OF

3  REYNOLDS                   )
                             )

4       Plaintiff            )
                             )

5  VS.                       ) NEWTON COUNTY, TEXAS
                             )

6  ASSOCIATED INSTALLATION   )
   GROUP, INC.               )

7                            )
       Defendant            ) 1ST JUDICIAL DISTRICT

8

9

10   *******************************************
              ORAL AND VIDEOTAPED DEPOSITION OF

11                   BILLY REYNOLDS
                  DECEMBER 18, 2018

12   *******************************************

13       ORAL AND VIDEOTAPED DEPOSITION of BILLY REYNOLDS,
    produced as a witness at the instance of Defendant, and

14  duly sworn, was taken in the above-styled and numbered
    cause on Tuesday, December 18, 2018, from 10:01 a.m. to

15  2:21 p.m., before Ada V. Christy, CSR in and for the
    State of Texas, recorded by machine shorthand, at the

16  offices of Jonathon Juhan, 985 I-10 North, Suite 100,
    Beaumont, Texas, pursuant to the Texas Rules of Civil

17  Procedure and the provisions stated on the record or
    attached hereto; signature having been waived.

18

19

20

21

22

23

24

25

                                              Page 1

AIMSJ0098                                      AIMSJ0006

```
 1    deposition is being taken for both cases.

 2                MR. BRAGG:  Yes.

 3                MR. NELSON:  State case and -- let's see,

 4    what county is it in?

 5                MR. BRAGG:  Newton County and federal.

 6                MR. NELSON:  Federal court, Houston

 7    District of Texas, Beaumont Division.  Agreed?

 8                MR. BRAGG:  Agreed.

 9                MR. GIACCO:  Agreed.

10                   BILLY REYNOLDS,

11    having been duly sworn, testified as follows:

12                 E X A M I N A T I O N

13    BY MR. NELSON:

14        Q.  Mr. Reynolds, can you state your name.

15        A.  Yes, sir.  Billy Gene Reynolds.

16        Q.  When were you born, Mr. Reynolds?

17        A.  September 14th, 1962.

18        Q.  Do you have family members that live up in

19    Newton County?

20        A.  Yes, sir.

21        Q.  And what are their last names?

22        A.  Reynolds.

23        Q.  Any other last names?

24        A.  Got some Simmons there, Reynolds, Smith.

25        Q.  I'm talking cousins.  Also on your wife's side,
```

AIMSJ0099                                        AIMSJ0007

1    A.  Yes, she did.

2    Q.  At Newton --

3    A.  Yes.

4    Q.  -- school district?  Okay.  And just so you

5  know, I have a daughter with Downs Syndrome, so I have

6  experience with special education.

7    A.  Oh, your daughter, huh?  Mine, too.

8    Q.  Let's talk about the house.  When did you build

9  this house or at least when did you start building your

10  house, the one that burned down?

11    A.  Well, I first had a trailer, and then 1996 one

12  of my real good friends, Jean Davis, Christian lady come

13  and said she was lead to give me a house.  So she -- she

14  give me the house, and it was a mile away from where we

15  lived.  And I went -- the church was going to -- I was

16  assistant co-pastor at AB -- Bush's church.  And we --

17  we had looked at the house, and it was too good a house

18  to just tear down, he felt, to get it moved.  So I

19  prayed and asked the Lord to -- if he would help me.  So

20  I went to the bank to get the money.  And I was already

21  in such debt, the bank wouldn't let me have no money.

22  And so I -- I was upset, and I hit stairs, and I said:

23  "Lord, why didn't you help me?"

24    Q.  So you've got two acres of lands; correct?

25    A.  Yeah.

Veritext Legal Solutions
800-336-4000

AIMSJ0100                                              AIMSJ0008

1    Q.   Did you buy the land yourself?   Did you pay for

2    it?

3    A.   Yes, I did.

4    Q.   All right.   So you bought the land.   You moved

5    a trailer on it.   And then this lady --

6    A.   Give me a house.

7    Q.   Give you a house.   And then you basically

8    eventually made the arrangements and got it moved;

9    correct?

10   A.   And I moved it; yes, sir.

11   Q.   All right.   And at the time you moved the

12   house, I assume you already had a septic on the land --

13   a septic?

14   A.   A septic, yes.

15   Q.   All right.   So you already had a septic tank.

16   Did you have a water well?

17   A.   Yes.

18   Q.   And you already had electricity because you had

19   the trailer there; right?

20   A.   Yes.

21   Q.   Did you have a -- did you have a propane tank

22   on the property?

23   A.   Yes, I did.

24   Q.   Okay.   So you got a trailer with a propane

25   tank, a well, a septic, and electricity?

Page 18

AIMSJ0101                                                AIMSJ0009

1     A.  Yes.

2     Q.  And so you didn't get rid of the trailer, I

3  assume; you just put the house somewhere else on the two

4  acres; correct?

5     A.  No.  I sold the trailer.

6     Q.  You sold the trailer.  All right.  So they

7  moved the trailer out, and they put the house in.  How

8  big was the house, how many square feet?

9     A.  The house, it was a 24-by-40, and I had put a

10  addition on the front of it, 12 by -- 12-by-24, and then

11  on the back put another addition, 12-by-24.

12     Q.  These are porches; right?  Are they enclosed,

13  these two additions or just opened?

14     A.  No.  No, they enclosed.  They were -- well,

15  they were complete.

16     Q.  Were they screened or were they wood all the

17  way around?

18     A.  No.  Half the front part, 12-by-12, was a

19  screened-in porch.  Other side was a bedroom.

20     Q.  All right.  And this house was on piers; right?

21     A.  Yes.

22     Q.  So all you had to do was put some lumber down

23  and then put stuff on the side walls; correct?

24     A.  Yes.

25     Q.  Are you an electrician or plumber, anything

Page 19

AIMSJ0102                                          AIMSJ0010

```
 1    like that?

 2        A.   No.

 3        Q.   But you can do things yourself; you have some

 4    do-it-yourself capabilities?

 5        A.   No.  I upgraded it to a 200-amp and already

 6    inspected it.

 7        Q.   Who put the electricity in?

 8        A.   The electricity was there.

 9        Q.   On the house?

10        A.   Yes.

11        Q.   And you just put a bigger box on the house?

12        A.   Yes.

13        Q.   And then you run the lines yourself around the

14    house; correct?

15        A.   Yes.

16        Q.   All right.  So you put in the electricity

17    yourself.  Did you do the plumbing yourself?

18        A.   The plumbing?  Yes.

19        Q.   Right?  So you did the plumbing also?

20        A.   Yes.

21        Q.   Put in a commode, tied the lines down, and you

22    hooked them to the other lines --

23        A.   Yes.

24        Q.   -- that ran to the septic; correct?  So you did

25    the plumbing and you did the septic yourself.  Did you
```

Page 20

AIMSJ0103                                                    AIMSJ0011

```
 1    do the air conditioning?

 2         A.   The --

 3         Q.   What kind -- well, let me ask, what kind of air

 4    conditioning did you have?  Window units or --

 5         A.   I had two brand new ones.

 6         Q.   Window units?

 7         A.   Window units.

 8         Q.   All right.  How did you heat the house?

 9         A.   I had a wood heater.

10         Q.   When you say wood heater, can you describe it

11    for me.

12         A.   Cast iron wood heater.

13         Q.   Like a pot belly stove?

14         A.   I guess.  You know, it was, you know, 24 inches

15    long or maybe 30 inches long and about probably 15 to

16    16 inches wide.

17         Q.   Did you have a stack that went through the

18    roof?

19         A.   No, through the wall.

20         Q.   Through the wall.

21         A.   Through the wall.

22         Q.   Okay.  So you had a side stack that came out

23    the wall?

24         A.   Yes.

25         Q.   Was it set up like a fireplace?
```

Page 21

AIMSJ0104                                              AIMSJ0012

```
 1    tank, so LP had come got their tank.
 2         Q.  On the day of the fire --
 3         A.  We had it leased -- on the day of the fire, no,
 4    we was electric.
 5         Q.  With the exception of the wood burning stove?
 6         A.  Except the wood burning stove.
 7         Q.  What temperature -- how cold does it have to
 8    get before you'll use the wood stove?
 9         A.  The wood stove, probably -- probably 40 degrees
10    we build a little light fire, you know, in it.
11         Q.  Would you clean out the stove --
12         A.  Yes.
13         Q.  -- regularly?
14         A.  Yes.
15         Q.  Was there a plug in the stove?  A plug.  Do you
16    have a plug or an ash bin or something like that in the
17    stove?
18         A.  No.  No, I had a heater shovel and a bucket;
19    and you had to scoop your ashes out, put it in the
20    bucket.  It's basically similar to a fireplace.
21         Q.  Did you have any kind of instructions that came
22    with this cast iron stove?
23         A.  My mother and daddy raised us on it.
24         Q.  And that's it?
25         A.  I do -- yeah, we used it.  I growed up from a
```

Page 32

AIMSJ0105                                                    AIMSJ0013

```
 1       A.  Tin.

 2       Q.  Tin.  You had a tin roof?

 3       A.  Tin.

 4       Q.  Corrugated?

 5       A.  Yeah.

 6       Q.  Now, did you have a barbecue pit or a grill,

 7   anything like that at the house?

 8       A.  I had one out front in front of the house.

 9       Q.  How far from the house was it?

10       A.  Probably 10 feet.

11       Q.  Now, when was this house moved on to the -- on

12   your property?  What year?

13       A.  In '96, 1996.

14       Q.  And it was donated to you, and you basically

15   had to pay for the cost to move?

16       A.  To move it.

17       Q.  And then did you do the hookup once it was

18   moved?

19       A.  Yes, I did.

20       Q.  Do you recall pulling any permits with the City

21   or getting any permits to hook the house up?

22       A.  No.  We never had to do that in the country

23   there.

24       Q.  Okay.  You had a friend who was an electrician

25   that helped you?
```

Page 36

AIMSJ0106                                              AIMSJ0014

1    A. Yes, I do. He was an electrician worked at the

2    mill and -- and if I had hooked even a light up, that I

3    always called him, make sure I was doing it right.

4    Q. Have you ever had an experience with a fire

5    before?

6    A. No.

7    Q. This is the first time you've ever had any type

8    of fire damage?

9    A. First time.

10    Q. Only time?

11    A. Huh?

12    Q. Only time you had any fire damage since this

13    fire?

14    A. No.

15    Q. This fire was on February 26th, 2016; correct?

16    A. Uh-huh.

17    Q. You have to answer yes or no.

18    A. Yes, sir.

19    Q. Okay. Now, how many people were at the house

20    that day when the fire occurred February 26th?

21    A. Me and my wife and my mother-in-law. She was

22    there. Annie Westbrook. That was Wally's mother.

23    Q. Who is Wally?

24    A. Wally Westbrook, my son-in-law.

25    Q. Now, who lives in your house, actually lives

Page 37

AIMSJ0107                                              AIMSJ0015

```
 1    with you on the 22nd of February?

 2         A.   The 22nd?

 3         Q.   The 26th, the day of the fire.

 4         A.   My mother-in-law was there, living there and --

 5    and Annie Westbrook, Wally Westbrook's mother was living

 6    there.

 7         Q.   And you and your wife?

 8         A.   And my son-in-law and my daughter was there.

 9         Q.   They lived there also?

10         A.   Yeah.

11         Q.   So there were six of you living in the house?

12         A.   Yes and --

13         Q.   Husband, your wife, mother-in-law?

14         A.   And my mother-in-law's boyfriend, he was there.

15    Mark Young.

16         Q.   So now you're talking about seven people living

17    there?

18         A.   I think so.  I believe.

19         Q.   Now, does your daughter and her husband have

20    their own house now, a trailer?

21         A.   No.

22         Q.   Where do they live?

23         A.   No, they was staying with us at --

24         Q.   Where do they live today?

25         A.   Oh, well, they're staying in the old church
```

Page 38

AIMSJ0108                                                      AIMSJ0016

```
 1   that we're staying in.
 2        Q.   What church are y'all staying in?
 3        A.   The old one I used to pastor there.
 4        Q.   In the country?
 5        A.   Yes.   In the country.
 6        Q.   What's the name of it?
 7        A.   Nations House of Prayer Church.
 8        Q.   And it's got bathrooms and --
 9        A.   Yes.
10        Q.   -- water?
11        A.   Yes.
12        Q.   Have a kitchen?
13        A.   Yes.
14        Q.   How big's the church?
15        A.   It's 20 -- 24-by-40.
16        Q.   Does anybody else use the church or just --
17   just your family and your daughter's family?
18        A.   Yes.
19        Q.   Just the four of y'all?
20        A.   Yes.
21        Q.   Nobody else is in the church?
22        A.   No.
23        Q.   Who owns the church?
24        A.   I do.
25        Q.   Did you pay for the church?
```

AIMSJ0109                                           AIMSJ0017

```
 1        A.   Yes.

 2        Q.   But you had Dish Network in the past; correct?

 3        A.   No, my daughter did, I believe.

 4        Q.   At that house?

 5        A.   I believe so.

 6        Q.   Your daughter had Dish Network at the house

 7   that burned on February 26th; correct?

 8        A.   They had Direct TV -- Direct TV there.

 9        Q.   So they already had -- they'd already put a

10   satellite system in the house before the 26th?

11        A.   Yes.

12        Q.   And on the 26th you called and asked -- or

13   maybe before the 26th, but you called and arranged for

14   Dish Network to come out and be installed; correct?

15        A.   No.

16        Q.   Who made that arrangement?

17        A.   Mark Young.

18        Q.   And Mark Young is the boyfriend of your

19   daughter's husband?

20        A.   Uh-huh.

21        Q.   All right.  Now, they were going to get it

22   installed in the room they were sleeping in?

23        A.   In -- in my son-in-law's room where they put

24   it.

25        Q.   So Mark Young -- your son-in-law and daughter
```

AIMSJ0110                                                    AIMSJ0018

1     slept in the same bedroom with her mother and her

2     mother's boyfriend?

3        A.   No.

4        Q.   Her mother and her mother's boyfriend were in

5     another room?

6        A.   Yes.

7        Q.   But they were -- were they going to have Dish

8     Network for more than one room or just one room?

9        A.   They had it in the living room and that bedroom

10   there.

11        Q.   How old is Mr. Young?

12        A.   Mr. Young? About 52, maybe. I don't know.

13        Q.   Now does Mr. Young live in the church?

14        A.   No.

15        Q.   Just you and your wife, your daughter and her

16     husband, the four of you?

17        A.   Yes.

18        Q.   And does your daughter have any children?

19        A.   No.

20        Q.   All right. So was Mr. Young, he was the one

21     made the arrangements to put the Dish Network in;

22     correct?

23        A.   Mr. Young.

24        Q.   Was Dish Network going to be in his name? Was

25     he going to pay the bill?

AIMSJ0111         AIMSJ0019

```
 1        A.  Yes, it was in his name.
 2        Q.  Who was there when the Dish Network was
 3   installed?
 4        A.  Me and my wife and my mother-in-law and Annie
 5   Westbrook, just the four of us in the house.
 6        Q.  Anybody out in the yard?
 7        A.  Yes.  The rest of them was playing horseshoes
 8   in the yard, my daughter and son-in-law.
 9        Q.  Who called --
10        A.  And Dekota Westbrook.  He was --
11        Q.  Who's Dekota Westbrook?
12        A.  -- there playing horseshoes in the yard.
13   That's Wally's son.
14        Q.  Wally --
15        A.  -- Westbrook's son.
16        Q.  -- Westbrook's son.  How old is Dekota?
17        A.  I don't really know.  I know he -- he's around
18   30, maybe.  I don't know.
19        Q.  All right.  How many people came out to install
20   the satellite system dish?  One?  Two?
21        A.  There was one man there.
22        Q.  One man.
23        A.  I seen.
24        Q.  He came out in a truck that had a sign that
25   said Dish Network; correct?
```

Page 44

AIMSJ0112                                              AIMSJ0020

1        A.   He was in a truck.

2        Q.   A van or --

3        A.   All I know where a bunch of dish -- dish

4    equipment on it.

5        Q.   Did you talk to the gentleman who came out to

6    install the satellite system?

7        A.   No, I seen him.

8        Q.   Who talked to the gentleman from the

9    installation company?

10       A.   I guess my son-in-law, Mark Young.

11       Q.   So Mark Young and Mr. Westbrook?

12       A.   Yeah.

13       Q.   So Mr. Young and Mr. Westbrook were talking to

14   the installation company.  Were they the ones who told

15   the gentleman from the installation company where to

16   install the two receivers?

17       A.   Yes.

18       Q.   And did you see the gentleman from the

19   satellite company tell them that I'm not going to put it

20   here; you have to put it here.  Did you see anything

21   like that?

22       A.   No.

23       Q.   So I take it from -- from what happened was

24   Mr. Young and Mr. Westbrook basically said we want the

25   two receivers in these two rooms; correct?  Correct?

Page 45

AIMSJ0113                                              AIMSJ0021

1       Q.  Mr. Young or Mr. Westbrook did all that?

2       A.  Yes.

3       Q.  Now, was it also Mr. Young and Mr. Westbrook

4  that told the installation guy:  This is where we want

5  you to route it?

6       A.  No.

7       Q.  Where did they put the satellite dish, where it

8  was installed?

9       A.  On the wall.

10       Q.  On the outside?

11       A.  On the outside of the wall.

12       Q.  Did you tell the installation man that you

13  didn't want it in that location?

14       A.  No.

15       Q.  You had no problems with where the installation

16  man installed the satellite dish, did you?

17       A.  No.

18       Q.  You didn't tell him you had any problems, did

19  you?

20       A.  No.

21       Q.  And you didn't tell him you had any problems

22  with him putting the receivers where he put the

23  receivers; correct?

24       A.  No.

25       Q.  You didn't tell the installation man don't run

Page 47

AIMSJ0114                                                AIMSJ0022

```
 1    Mr. Westbrook or Mr. Young telling the installation man
 2    I want you to do it this way or that way?  Did you see
 3    anything like that?
 4        A.  No.
 5        Q.  So did you see the installation man put the
 6    satellite -- the satellite receiver on the outside of
 7    the house?  Did you see him do that?  Did you see him
 8    put the satellite receiver on the outside of your house?
 9        A.  On the outside?
10        Q.  Yeah, you told me that the installation man put
11    the --
12        A.  The dish.
13        Q.  -- the dish on the outside.
14        A.  He put the dish out there.
15        Q.  Okay.
16        A.  And the receiver was in the bedroom.
17        Q.  Did you see the gentleman from the installation
18    company run the wire?
19        A.  No.
20        Q.  Was there anybody that was walking with the
21    installation man while he was putting the wire in the
22    house?
23        A.  My son-in-law.
24        Q.  Did your son-in-law either before, during, or
25    after the installation say there were any problems with
```

AIMSJ0115                                              AIMSJ0023

1  the way that the installation man installed the wiring?

2      A.  No.

3      Q.  Did your son-in-law or Mr. Young tell you that

4  the installation man didn't run the wiring like we told

5  him to?

6      A.  No.

7      Q.  You never heard -- I assume Mr. Young didn't

8  criticize the installation either; correct?

9      A.  I don't know.  I wasn't there.  I just had come

10  in and seen the man standing in front of the TV.

11      Q.  I'm talking about even after the installation.

12  Did Mr. Young or Mr. Westbrook at any time tell you that

13  they thought the installation had been wired improperly?

14      A.  No.

15      Q.  Did Mr. Young or Mr. Westbrook ever tell you at

16  any time that the person who installed the dish had put

17  the dish in incorrectly?

18      A.  No.

19      Q.  Did Mr. Young or Mr. Westbrook ever tell you

20  that they believe that the person who installed the

21  receiver, the installation man, improperly installed the

22  receivers in the house?

23      A.  No.

24      Q.  Did you see Mr. Young or Mr. Westbrook talk to

25  the gentleman who was installing the dish and receivers

Page 50

AIMSJ0116                                           AIMSJ0024

1    and running the wires?

2        A.   No.

3        Q.   And during all this time during the

4    installation where were you located?

5        A.   Do what?

6        Q.   Where were you situated on the -- in the house

7    during this installation?

8        A.   I was --

9        Q.   Were you in the house during the installation

10   or outside the house?

11       A.   Oh, well, he -- well, he had already put the

12   cable in there, I guess.  He was standing in front of

13   the TV, the dish -- the Dish Network technician was

14   standing in front of the TV.

15       Q.   Were you there when the man pulled up in the

16   Dish Network truck?

17       A.   No.  I -- I pulled up, and he was sitting in

18   the driveway.  And -- and me and her got out, went in

19   the house, and he was standing in front of the TV.

20       Q.   So the whole installation had been done before

21   you even got there; correct?  The dish man had already

22   put in the dish by the time --

23       A.   Yeah.

24       Q.   -- you got there?

25       A.   Yeah.  Well, he was trying to push the buttons

                                              Page 51

AIMSJ0117                                    AIMSJ0025

1    on the remote control standing in front of the TV.

2         Q.   So the cables had all been run before you got

3    there?

4         A.   Yeah.

5         Q.   The receivers had been put in the house before

6    you got there?

7         A.   Yes.

8         Q.   The dish had been installed on the outside of

9    your house before you got there?

10        A.   Yes.

11        Q.   And once you got there, did you talk to

12   Mr. Young and Mr. Westbrook about the installation at

13   all?

14        A.   No.

15        Q.   Did you ever talk to Mr. Young or Mr. Westbrook

16   after the fire about the installation?

17        A.   After the fire?  No.

18        Q.   Did you talk to them?

19        A.   No.

20        Q.   So the only two people that know -- the only

21   two people who were in the house that know about the

22   installation would be Mr. Westbrook and Mr. Young;

23   correct?

24        A.   I imagine.  They --

25        Q.   Do you have anything to believe that your

                                                    Page 52

AIMSJ0118                                        AIMSJ0026

```
 1        A.   No.

 2        Q.   Did your mother-in-law talk to the installation

 3   man?  Do you know that --

 4        A.   I don't know.

 5        Q.   -- whether she did?  But you know that

 6   Mr. Young and Mr. Westbrook did; correct?  Mr. Young and

 7   Mr. Westbrook did talk to the installation man; correct?

 8        A.   They had to talk to him to get him in there to

 9   put it in there.

10        Q.   What about your daughter; did your daughter

11   talk to the installation man?

12        A.   I don't know.

13        Q.   Did she ever tell you that she did?

14        A.   No.

15        Q.   And you said that you had Direct TV before.

16   Were there cables already running through the house?

17   Did you already have cables in the house?

18        A.   Yes.  They had a -- Direct TV had a cable in

19   there.

20        Q.   So you already had cable that ran to both rooms

21   or just to one room or to how many rooms?

22        A.   To two rooms.

23        Q.   So the Direct TV ran to the same two rooms as

24   the Dish Network did?

25        A.   Yes.
```

Page 54

AIMSJ0119                                                    AIMSJ0027

1    Q.  And the cables were still in there from Direct

2    TV; correct?

3    A.  Yes.

4    Q.  But the dish for Dish Network was different

5    from the Direct TV dish; correct?  You got a new dish

6    for Dish Network; correct?

7    A.  Yes.

8    Q.  What happened to the Direct TV dish?  Was it

9    still on -- still hooked on to the house?

10    A.  No, it was -- well, they had it out by in front

11    of the house.

12    Q.  On a pipe?

13    A.  On a pipe.

14    Q.  But the cables ran to the same two rooms;

15    correct?  The Direct TV and the Dish Network use the

16    same cables?

17            MR. BRAGG:  Objection; form.

18    Q.  (BY MR. NELSON)  To your knowledge, were the

19    same cables used for the Direct TV as --

20    A.  I don't know --

21    Q.  -- the Dish Network.

22    A.  -- how they run.  I wasn't there.  You know, I

23    just walked in -- and -- and seen the -- seen the

24    technician standing in front of the TV.  And a lot of

25    static was on it, so I went into my bedroom and laid

Page 55

AIMSJ0120                                        AIMSJ0028

1      Q.   (BY MR. NELSON)   What I would like to talk

2   about is one of the exhibits that you have there in

3   front of you is Exhibit No. 10.

4              MR. BRAGG:   I've got actually six pages

5   after the cover page.   That's all right?

6              MR. NELSON:   It's probably more than that.

7   I may have the wrong exhibit number.   What's Exhibit No.

8   9?

9              MR. BRAGG:   10 is the incident report.

10             MR. NELSON:   10 is the one that I want to

11   ask him about then.

12             MR. BRAGG:   Six pages.

13             MR. NELSON:   Yeah.

14             MR. BRAGG:   Okay.

15      Q.   (BY MR. NELSON)   You said that you had gone in.

16   You walked through the house.   You saw the installation

17   guy in front of the television in Room No. D, and there

18   was static on there.   And then you walked into the back

19   bedroom in Room No. G and laid down on the bed; correct?

20      A.   Uh-huh.

21      Q.   Was there a television in Room G also?

22      A.   No.

23      Q.   Was there a receiver in Room G?

24      A.   No.

25      Q.   All right.   But you had -- could you hear what

AIMSJ0121                                                      AIMSJ0029

```
 1        A.   No.

 2        Q.   And none of the firefighters that were out

 3   there told you that the fire had been caused by

 4   equipment use; correct?  None of the firefighters that

 5   were out there on February the 26th of 2016, told you

 6   that the equipment was the cause of the fire?

 7        A.   No.

 8        Q.   And when I say equipment, I mean, everything.

 9   It wasn't caused by the cables.  It wasn't caused by the

10   dish.  It wasn't caused by the receiver.  No equipment

11   had anything to do with this fire; correct?

12             MR. BRAGG:   Objection; form.

13        Q.   (BY MR. NELSON)  Let me ask you this:  Did any

14   firefighter tell you they determined what the cause of

15   the fire was?

16        A.   No.

17        Q.   And none of the firefighters told you that the

18   fire was caused by the installation of this Dish Network

19   equipment?

20        A.   No.

21        Q.   All right.  Let's go down to comments.  Do you

22   see where the comment section is?

23        A.   Yeah.

24        Q.   And, you know, maybe if you turn to the second

25   page, it may be easier to read on the second page.  Do
```

Page 62

AIMSJ0122                                                    AIMSJ0030

1    you see where the comment section is?

2        A.   Yeah.

3        Q.   "Owner states the Dish TV box was on fire."  Do

4    you see that?

5        A.   Yeah.

6        Q.   And then the next line says:  Newton had six

7    trucks out there, six fires trucks and 14 people.  And

8    Bohn River had six people with four trucks.

9        A.   Uh-huh.

10       Q.   Does that sound about right, like there were

11   about ten trucks out there, ten fire trucks out there?

12       A.   I don't really know.  I was laying in the ditch

13   unconscious out there, me and my wife both; so I don't

14   know what was -- I don't know.  We was laying on the

15   cold, wet ground.

16       Q.   And then they said -- is it Twin Creek -- is

17   there a place called Twin Creek?

18       A.   Quick Sand Creek.

19       Q.   Quick Sand Creek.  They sent two trucks with

20   five people.

21       A.   Well, that's what that says.

22       Q.   But you can't recall; correct?

23       A.   No.

24       Q.   But the last line is what I really want to

25   focus on.  See where it says comments:  Plug from heater

Page 63

AIMSJ0123                                                    AIMSJ0031

1    thought to start fire.

2            Do you see where that says?

3        A.  Yeah.  I don't know -- I don't know.  They

4    didn't investigate it, though.

5        Q.  But the fireman -- pardon me.  Go ahead.

6        A.  I don't know who made that statement there.

7        Q.  Well, this statement would have been made by

8    somebody at the volunteer fire department; correct?

9        A.  I guess.  It's on there.

10        Q.  Well, it says comments.  Do you have any reason

11   to believe anybody other than Chief Herb Kelly wrote

12   this stuff.  Look at Mr. Kelly's handwriting.  Doesn't

13   that look like the handwriting up above?

14        A.  I don't know.  I don't know his handwriting.

15        Q.  Do you know Herb Kelly?

16        A.  Yeah, he -- he's supposed to be the chief fire

17   marshal.

18        Q.  Well, Herb Kelly said -- at least that looks

19   likes his handwriting -- and you don't have any reason

20   to believe it's somebody else's handwriting, do you?

21        A.  Huh-uh.

22        Q.  Do you know anybody else who would have written

23   in the comment section on this fire department report

24   other than Chief Kelly?  Do you know anybody else who

25   would have written in there?

Page 64

AIMSJ0124                                           AIMSJ0032

1      A.   No, I'd say it's a false statement.

2            MR. GIACCO:   Objection; responsive.

3      A.   False statement because I know what burned my

4   house down.

5      Q.   (BY MR. NELSON)   We'll get to that in a minute.

6   But the fire chief who deals with these fires all the

7   time said that the plug from the heater was sought to

8   start the fire.   Would you agree with me that Chief

9   Kelly has more experience in fires than you do?

10            MR. BRAGG:   Objection; form.

11      A.   Well, what he can see he would, but what I seen

12   I have more experience there.

13      Q.   (BY MR. NELSON)   Would you agree with me that

14   Chief Kelly's done more fire investigations than you've

15   done?

16      A.   I imagine he's done a lot of them.

17      Q.   Have you ever done a fire investigation?

18      A.   No.

19      Q.   Not one.   Do you know what NFP 921 is?

20      A.   Huh-uh.   Sure don't.

21      Q.   Well, I'll represent to you NFP 921 is the

22   standard they use for fire analysis when they're

23   analyzing fires.   And that's -- it's a standard that's

24   similar to -- do you know what ASTME stands for?

25      A.   Huh-uh.

AIMSJ0125                                                    AIMSJ0033

1   job?

2       A.   I don't know.  All I ever heard about him he

3   was policeman stopped people.  That's -- I ain't never

4   heard nothing about him.

5       Q.   You heard anything bad about Chief Kelly?

6       A.   No.

7       Q.   And you don't know of any reason why Chief

8   Kelly would have put in "plug from heater thought to

9   start fire" unless he didn't believe that?

10      A.   Yeah, I do, because the heater was the only

11  sitting out there where you could see it sitting in the

12  wide open.  So what else would you think, you know, all

13  the tin wasn't moved off the other rest of the house,

14  so, you know, that's poorly investigation.

15      Q.   Well, did you -- were you at your house when

16  somebody else came out to take a look at the house after

17  the fire?

18      A.   Yeah.  I was there.

19      Q.   Who else was there that day when they came out

20  to look at the house?

21      A.   Denver, Colorado, investigators.

22      Q.   Anybody else?

23      A.   Mr. Juhan and Dish Network attorney was there.

24  I don't -- all I knew was Mr. Juhan.

25      Q.   So your lawyer was there?

AIMSJ0126                                                    AIMSJ0034

```
 1        A.  Yeah.

 2        Q.  So you had your lawyer there.  Was your wife

 3   there with you?

 4        A.  No.  She wasn't there.

 5        Q.  Did you have a fire investigator look at it for

 6   you?  Did you hire a fire investigator --

 7        A.  No.

 8        Q.  -- come look at the scene?  So we know that the

 9   fire department came out and looked at it.  They looked

10   at it the day of the fire; correct?  Correct?

11        A.  Looked at it?

12        Q.  Looked at your house the day of the fire?

13        A.  Yes.

14        Q.  The volunteer fire department wrote this report

15   the day of the fire; correct?  February 26th, 2016,

16   that's the day of the fire?

17        A.  Yes.

18        Q.  And how many days after the fire did these --

19   did this other investigator come out and take a look at

20   the house?

21        A.  I don't -- I don't remember.

22        Q.  But you -- you were never denied the ability to

23   go out and have somebody investigate the scene of the

24   fire; correct?  You could have had somebody come out and

25   take a look at the fire after the fire; correct?
```

Page 68

AIMSJ0127                                              AIMSJ0035

```
 1        A.   No.

 2        Q.   -- say we're bringing Dish out?

 3        A.   Yeah, I think they mentioned it to me, that

 4   they was going to switch over to Dish.

 5        Q.   Have you -- did you do any type of research on

 6   Dish before it was installed?

 7        A.   No.

 8        Q.   So you weren't influenced by any advertising

 9   associated with Dish; correct?

10        A.   No.

11        Q.   You didn't open a newspaper, see a Dish

12   advertising and so go get Dish?

13        A.   Huh?

14        Q.   You didn't look at any advertising in the

15   newspaper, in a magazine, on television?

16        A.   No.

17        Q.   The decision to put Dish in your house wasn't

18   in any way influenced by advertising?

19        A.   I don't guess.

20        Q.   And no warranty, no representation that this is

21   going to be safe; you don't have to worry, anything like

22   that, caused you to go out and put Dish in your house,

23   Dish Network?  Correct?

24        A.   Huh?

25        Q.   No warranty -- you didn't see anything or read
```

Page 76

AIMSJ0128                                                    AIMSJ0036

1    anything that said, look, if we put Dish in here, we're

2    not going to have any problems; everything's going to be

3    safe?  There wasn't any warranty you were relying upon

4    putting Dish in?

5                    MR. BRAGG:  Objection; form.

6        A.  No, they didn't warrant me.

7        Q.  (BY MR. NELSON)  And you'd used satellite

8    television products before; you knew how to use them?

9        A.  Huh?

10       Q.  You knew how to use satellite dish type

11   products before the fire?

12       A.  No.  All this new stuff, I don't know nothing

13   about it.

14       Q.  Have you ever used Direct TV before?

15       A.  No.

16       Q.  You had Direct TV in the house, and you never

17   used it?

18       A.  I never have.

19       Q.  Do you watch TV?

20       A.  Well, if it's gospel singing or preaching or

21   something or little comedy show, I will once in a while.

22       Q.  Well, have you ever used the remote in one of

23   those Dish Network?

24       A.  No.

25       Q.  Never used the remote?  Do you watch TV?

                                              Page 77

AIMSJ0129                                    AIMSJ0037

1    that number -- D?

2        A.   No.

3        Q.   From Room G.  You were in Room G.

4        A.   Yeah, we come out of Room G through Room F down

5    through E and -- and looked through the door there at

6    the bedroom.  There was a door there and a door there.

7    And back up in there fire was all around the box.

8        Q.   Yeah, could you hold that up so she can see

9    that.

10       A.   (Witness complies.)

11       Q.   All right.  So from where you sit in Room G

12   where you're in the bedroom G, there's no connecting

13   door to Room D?

14       A.   No.  Just a door in the hallway there.

15       Q.   All right.  So you have to go from Room G up to

16   Room F through Room E, and then you said you had to look

17   back into Room D; but the box is in the back corner of

18   the room, so you have to look into the room and then

19   look back --

20       A.   Yeah.

21       Q.   -- toward the wall of G; correct?

22       A.   Yeah.

23       Q.   So you cannot see the box, the dish box that

24   you said was on fire as you walk through Room G, Room F,

25   or Room E; correct?

AIMSJ0130                                                    AIMSJ0038

1      A.  Yes, the door was open.

2      Q.  No, you have to go through the door and then

3   look back; correct?

4      A.  No.  No.  It's just like a -- the doorway here

5   and right here is the doorway to there, and here's the

6   doorway to the kitchen and -- and from standing there, I

7   could see straight into the room.

8      Q.  Well, let's just take a look at this room right

9   here; okay?  Would the dish box be like where the globe

10  is; it would be back in the corner, and the door would

11  be right there?  Would that be similar to Room D?

12          MR. BRAGG:  Objection; form.

13     A.  Yeah, it was --

14     Q.  (BY MR. NELSON) Similar to this?  Could the

15  videographer just get a picture of the door back to

16  where the globe is.

17          (Videographer complies.)

18     Q.  (BY MR. NELSON)  All right.  So you basically

19  have to open this door, and then you have to --

20     A.  You have look around the -- you have to look

21  around the door facing and then I -- and I could see in

22  there.

23     Q.  All right.  But the explosion had already

24  occurred.  You'd already been shook -- the house had

25  shaken.  You get up out of G, you walk into F and E, and

Page 89

AIMSJ0131                                          AIMSJ0039

```
 1    were putting you in the ambulance, did you ever talk to
 2    any of the nurses?
 3         A.   Huh-uh.
 4         Q.   Well, it said they found -- again on page 141
 5    it said the emergency people said they found Mary seated
 6    and alert on the ground.  The house was a total loss,
 7    and that Mary was in the bedroom.  There was an
 8    explosion in another room of the house.  The whole house
 9    shook, and then it caught on fire.
10              So what they -- information they
11    received -- received parallel with what you gave them;
12    correct?  The house shook -- there was explosion.  The
13    house shook, and then the room caught on fire?
14         A.   We heard the same thing, seen the same thing.
15         Q.   Right.  Does -- let's go to page 175.  They
16    also did an x-ray of Mary.  And what they found when
17    they did Mary was the same thing they found with you,
18    that the heart and the lung space was normal in size,
19    and there were no air space opacity, which means the
20    lungs were clear.  There wasn't anything in there to
21    indicate that the lungs had -- had any problems from
22    smoke inhalation or anything like that.  They also said
23    again no plural infusion, which means there was no fluid
24    in the lungs.
25         A.   Yeah.
```

AIMSJ0132                                                    AIMSJ0040

1    Q.  Were the windows blown out?  Did D have windows

2  in it?

3    A.  D had windows in it, and they were blew out.

4    Q.  The windows blew out?

5    A.  With pressure.

6    Q.  Where's -- and the electric stove is in E?

7    A.  The electric stove in E.  There was nothing on

8  fire in E.

9    Q.  The stove wasn't on?

10    A.  No.  Well, after the explosion there wasn't

11  nothing on fire but in D.

12    Q.  Where is the door to C, the bathroom?

13    A.  The door to --

14    Q.  To the bathroom, where is it located.  Is there

15  one door or two doors?

16    A.  It's right -- it's right straight across from E

17  door.

18    Q.  So it's -- the door to the bathroom is not

19  connected to D.  It's not connected to C.  It's

20  connected to E?

21    A.  Yeah.

22    Q.  Okay.

23    A.  It was connected.  It ain't now.

24    Q.  Were there any windows blown out in Room G?

25    A.  No.

Veritext Legal Solutions
800-336-4000

AIMSJ0133        AIMSJ0041

```
 1   right-hand side, on the side that -- the -- on the
 2   side -- on the side where the heater was there.
 3        Q.  Where in the bathroom was the commode located?
 4   See, you have the pictures of the bathroom right there
 5   between --
 6        A.  Oh.  Oh, yeah, right here, bath and --
 7        Q.  Where was the commode?  Which wall was the
 8   commode?
 9        A.  Doorway was here coming in.  The commode was
10   here.  Bathtub was over here.  Lavatory sink was over
11   here.
12        Q.  And where was the septic?
13        A.  The septic, it was -- it was about 12 foot over
14   here.
15        Q.  Do -- did you get your septic pumped out
16   regularly?
17        A.  No, I didn't.
18        Q.  Did you ever pump it out from the time --
19        A.  No.
20        Q.  So from '96 to 2016, that would be a 20-year
21   period.  In that 20-year period, you never pumped it
22   out?
23        A.  Huh-uh.
24        Q.  No?
25        A.  No.
```

Page 134

AIMSJ0134                                           AIMSJ0042

```
 1      Q.   Did you have a 500-gallon tank?
 2      A.   No.  I think it --
 3      Q.   Thousand?
 4      A.   No.  It wasn't that big.  It was a small, small
 5   home-built tank.
 6      Q.   How long did the lateral lines run?
 7      A.   Do what?
 8      Q.   Lateral lines, how far did they run?
 9      A.   Oh, they run probably 120 feet or so.
10      Q.   Did you ever use an auger in those pipes to go
11   down and clean out the pipes?  Did you ever use that?
12      A.   In the pipes?
13      Q.   Yes.
14      A.   No, I never had trouble with roots growing in
15   it.
16      Q.   Where was the kitchen sink located?
17      A.   Kitchen sink, right here.
18      Q.   And the lines from the kitchen sink ran
19   straight to the bathroom and out to the septic; right?
20      A.   No.  They went straight out all the way out
21   across the drive in front by the cypress trees.
22      Q.   So, in your sink all you had was gray water?
23      A.   Huh?
24      Q.   Gray water.  Gray water.
25      A.   Dish water.
```

1 and a piece dripped down on my arm there.

2    Q.   Well, clarify.  Did it come through the wall,

3 or come through the ceiling?

4    A.   Well, right at the top of the plate or

5 somewhere there, you know, it was right there.  All I

6 know, a piece of fire hit me and burned me on the arm

7 some.

8    Q.   Where were you standing?

9    A.   When?

10    Q.   When it hit you.

11    A.   Oh, I was going down the hallway just on the

12 other side the bedroom from that -- in the kitchen part,

13 you know, down by the wall, and it fell out and hit me

14 on the arm there.

15    Q.   Okay.  If I understood your testimony, you

16 saw -- when you looked around the corner and looked in

17 D, there was flames all over Room D; right?

18    A.   Yes.  And most of it was in that corner back

19 there where the dish box was.

20    Q.   But there was flames all through the room by

21 time you looked in; right?

22    A.   No.  I just seen the corner burning back in

23 there.

24    Q.   What was burning?

25    A.   The -- well, where the dish box and TV and all

Page 147

AIMSJ0136                                    AIMSJ0044

1    was in there.

2        Q.  But what was on fire?

3        A.  Well, that whole corner was on fire.

4        Q.  And what was in that corner that was burning?

5        A.  The dish and the TV and all that.

6        Q.  So the TV and the box.  Was there anything else

7    that was burning?

8        A.  No.

9        Q.  So at that point when you're looking, the only

10   things that are on fire are the dish box and the TV?

11       A.  Yeah.

12       Q.  Nothing else?

13       A.  No.  I didn't see nothing else.

14       Q.  So by time you got around back into G, the wall

15   had burned entirely through, and fire was coming down on

16   you?

17       A.  Yeah.  Yeah.

18       Q.  How long did it take for you to get back to G

19   to get your wife out?

20       A.  Not long.  I don't know, about --

21       Q.  Less than 30 seconds?

22       A.  Probably or something.

23       Q.  Was there smoke?

24       A.  Yeah, there was smoke and fire.

25       Q.  Was there smoke in the kitchen?

Page 148

AIMSJ0137                                                    AIMSJ0045

1     Q.  Were they wild or were in a cage?

2     A.  No, tame.

3     Q.  They were in a cage?

4     A.  In a big glass cage.  I had a big glass cage in

5 that F there.  It was like my day room, and I'd go in

6 and sit in my recliner and watch the doves and --

7     Q.  Did you have any space heaters in the house?

8     A.  Huh?

9     Q.  Did you have any space heaters?

10    A.  Space heaters?  I had one.

11    Q.  Where was it?

12    A.  It was in there with the doves.

13    Q.  Where was that?  In A?

14    A.  That was in F.

15    Q.  In F?

16    A.  In F.

17    Q.  It's the only space heater you had?

18    A.  Yes.

19    Q.  There was no space heater in D?

20    A.  No.

21    Q.  Is there a reason on your list of property you

22 didn't list the space heater?

23    A.  No.

24    Q.  You have an opinion --

25    A.  I don't think.  I might have.  I don't know if

Page 151

AIMSJ0138                                            AIMSJ0046

```
 1        Q.   You can see the frame.  What is this right here
 2   between --
 3        A.   That's the old patch with something.  Something
 4   was there.  I had patched it there.
 5        Q.   So you patched -- patched the exterior wall?
 6        A.   Yeah.  Yeah, that wall was --
 7        Q.   And was there a hole in the interior wall also?
 8        A.   No, I don't think.
 9        Q.   Well, what I'm trying to get at, was there a
10   cavity that runs between where the pipe was for the
11   heater all the way back through the window and
12   everything towards Room No. D in the bathroom because
13   that looks like a cavity that runs all the way from the
14   wood stove back to the bathroom and possibly Room D.
15   You don't know?
16        A.   No.  Huh-uh.
17        Q.   All right.
18        A.   No, I don't know -- now in the wintertime we
19   would nail boards up and put plastic up over the wall
20   to -- to make it warm in the house.  My daddy done that
21   to his house, you know, it would have cracks in it
22   sometimes and --
23        Q.   So you had seams --
24        A.   -- keep air from coming through.
25        Q.   You had seams and cracks and cavities that
```

Page 175

AIMSJ0139                                                    AIMSJ0047

# Exhibit 2

| | | |
|---|---|---|
| **BILLY REYNOLDS AND MARY REYNOLDS** | § | |
| | § | **C.A. NO. 1:18-cv-00065-MAC** |
| **V.** | § | |
| | § | **JURY DEMAND** |
| **DISH NETWORK** | § | **AFFIDAVIT SUPPORTING** |
| | § | **MOTION FOR SUMMARY** |
| **V.** | § | **JUDGMENT** |
| | § | |
| **ASSOCIATED INSTALLATION GROUP,** | § | |
| **INC.** | § | |

## AFFIDAVIT

My name is Gregory B. Gordon. I am employed by NEFCO Fire Investigations and the Houston Fire Department. I am a Certified Fire Investigator (IAAI-CFI) through the International Associate of Arson Investigators. I am also a Certified Fire and Explosion Investigator (CFEI) and Certified Vehicle Fire Investigator (CVFI) through the National Association of Fire Investigators. All of my certifications are current.

I am competent to make this affidavit. I have never been convicted of a felony or a crime of moral turpitude. I have attached my current resume (Exhibit A), which accurately reflects my knowledge, training, experience, education, and specialized knowledge in investigating fire scenes and the origin and cause of fires. I have never been struck as a fire investigation expert nor has my testimony ever been limited as a fire investigation expert.

I personally visited the scene of the fire involving Billy and Mary Reynolds' house in Newton, Texas. Billy Reynolds and his legal counsel were present while I visited the fire scene and performed my investigation. I performed my investigation of the fire at the Reynolds' house pursuant to NFPA 921; more particularly, pursuant to the general methodology set forth in Chapter 4, and the origin and cause methodologies set forth in Chapters 18 and 19 of NFPA 921. Other methodologies, set forth in NFPA 921, were also relied upon during my investigation of the Reynolds' house fire scene and in reaching my opinions in this case.

My opinions in this case are based on my use of the systematic approach, relied upon by experts in the field of fire investigation, and as described in NFPA 921. The methodologies set forth in NFPA 921 for fire investigation are generally accepted within the fire investigation community as a guide for conducting and determining the origin and cause of fires. The purpose of NFPA 921 is to increase the reliability of conclusions arrived at by fire investigators.

Gregory Gordon Affidavit 1

While at the scene of the fire, I documented the main structure, the neighboring out buildings, the burnt motor vehicle, the accessible remains of the house, the roofing materials, the accessible charred wood floors, the burnt appliances, the metal remains of various pieces of furniture, the accessible electrical wiring, outlet boxes, the satellite dish equipment, and the wood burning stove. The Reynolds' house and contents were almost completely consumed in the fire. There were no interior or exterior walls left standing and the floors of the house had also been largely consumed.

I have attached true and correct copies of photos of the Reynolds' house that I took on the day of my inspection/investigation (Exhibit B). The attached photos have not been altered or modified in any way. The attached photographs correctly represent the depicted scene or objects I observed on the day of my inspection. I also reviewed the attached Newton Volunteer Fire Department Incident Report from the fire at the Reynolds' house (Exhibit C), in which the Newton Fire Chief stated, "plug from heater thought to start fire".

I prepared a report after my investigation of the fire scene and my interview of Billy Reynolds at the fire scene. Since composing my report, I have had the opportunity to review the deposition testimony of Billy Reynolds taken in this case along with the exhibits introduced in that deposition. Further, I reviewed the affidavit of Danny Parker, an exhibit attached to the motion for summary judgment in this case.

The cause of any fire falls into four different classifications: accidental, incendiary, natural, and undetermined, per Chapter 20 of NFPA 921. During my investigation, I could not conclusively determine a sequence of events that would bring a competent ignition source and fuel source together that would cause the observed damage in the Reynolds' house. I could neither explain nor verify the growth and development of the fire, as described by Billy Reynolds, by the data and information supplied by Billy Reynolds or by my observations of the fire scene.

After considering all credible hypotheses and data related to the fire at the Reynolds' house, and using the methodologies set forth in NFPA 921, the opinions in my investigative report have not changed. They are as follows:

1. The origin of the fire is undetermined.

2. The cause of the fire is undetermined.

3. The ignition source for the fire is undetermined.

4. The fire is classified as undetermined.

There is not one hypothesis that brings forth a fuel and competent heat/ignition source that is consistent with the data observed at the fire scene or presented by the witnesses and parties. Therefore, I could not conclusively determine the cause, origin, or ignition source of the fire.

The records attached hereto are the original or exact duplicates of the original.

Affiant sayeth nothing further.

Signed this _22_ day of _February_, 2019.

Gregory Gordon Affidavit 2

Gregory Gordon

SWORN TO and SUBSCRIBED before me by Gregory Gordon on the _22_ day of February, 2019.

_____

Notary Public in and for the
State of Texas

MARIA D REGINO
Notary ID #131206773
My Commission Expires
July 13, 2021

# EXHIBIT A

AIMSJ0144

AIMSJ0052

# GREGORY B. GORDON IAAI-CFI, NAFI-CFEI, CVFI
## NEFCO Fire Investigations
## 1 Pickering Road
## PO Box 7399
## Rochester, NH 03839
## 1-800-675-8500

| Employment | NEFCO Fire Investigations | 2017-Present |
|---|---|---|
| | Fire Analyst/Houston, TX | |
| | **Houston Fire Department** | **1994-Present** |
| | Arson Investigator/Houston, TX | 2007-Present |
| | Engineer and Operator | 2004-2007 |
| | Fire Fighter and Paramedic | 1994-2004 |
| | **Rimkus Engineering and Consulting** | **2010-2017** |
| | Fire Investigator/Houston, TX | |
| | **Fort Bend County EMS** | **1992-1994** |
| | Paramedic/Richmond, TX | |
| | **Tomball Fire Department** | **1985-1992** |
| | Fire Fighter and EMT/Tomball, TX | |

| Specialized Qualifications | Certified Fire Investigator through the IAAI |
|---|---|
| | Certified Fire and Explosion Investigator through NAFI |
| | Certified Vehicle Fire Investigator through NAFI |

| Professional Affiliations | Texas Firefighters Association |
|---|---|
| | Texas Municipal Police Association |

| Education | **University of Houston – Houston, TX** | **1985** |
|---|---|---|
| | Bachelor of Arts in History | |

**Professional Training**

CFI Trainer

| | |
|---|---|
| Understanding Undetermined—3 tested hours | 2019 |
| Investigating Motor Vehicle Fires – 4 tested hours | 2018 |
| Investigating Fatal Fires – 4 tested hours | 2018 |
| Ethical Duties Beyond the Fire Scene – 3 tested hours | 2018 |
| Accreditation, Certification, and Certificates – 3 tested hours | 2018 |
| Motor Vehicles: Transmission, Exhaust, Brake, and Accessory Systems – 3 tested hours | 2018 |
| Introduction to Youth-Set Fires – 3 tested hours | 2018 |
| Fire Chemistry – 3 tested hours | 2018 |
| Arc Mapping Basics – 4 tested hours | 2018 |
| The Impact of Ventilation In Building Structures on Fire Development – 4 tested hours | 2018 |
| Thermometry, Heat, and Heat Transfer – 3 tested hours | 2017 |

| | |
|---|---|
| Critical Thinking Solves Cases – 4 tested hours | 2012 |
| Effective Investigation and Testimony – 3 tested hours | 2012 |
| Ethics and the Fire Investigator – 3 tested hours | 2012 |
| Explosion Dynamics – 4 tested hours | 2012 |
| Fire and Explosion Investigations: Utilizing NFPA 1033 and 921 – 4 hours | 2012 |
| Fundamentals of Interviewing – 4 tested hours | 2012 |
| Fundamentals of Residential Building Construction – 3 tested hours | 2012 |
| Investigating Motor Vehicle Fires – 4 tested hours | 2012 |
| MagneTek: A Case Study in the Daubert Challenge – 2 tested hours | 2012 |
| Motive, Means, and Opportunity: Determining Responsibility in an Arson | 2012 |
| Case – 4 tested hours | |
| Writing the Initial Origin and Cause Report – 3 tested hours | 2012 |
| A Ventilation-Focused Approach to the Impact of Building Structures and | 2011 |
| Systems on Fire Development – 4 tested hours | |
| Arc Mapping Basics – 4 tested hours | 2011 |
| Documenting the Event – 4 tested hours | 2011 |
| Electrical Safety – 3 tested hours | 2011 |
| Fire Investigator Scene Safety – 3 tested hours | 2011 |
| Introduction to Evidence – 4 tested hours | 2011 |
| Introduction to Fire Dynamics and Modeling – 4 tested hours | 2011 |
| Investigating Fatal Fires – 4 tested hours | 2011 |
| Physical Evidence at the Fire Scene – 4 tested hours | 2011 |
| Search and Seizure – 4 tested hours | 2011 |
| The Scientific Method for Fire and Explosion Investigation – 3 tested hrs | 2011 |

Fire Findings

| | |
|---|---|
| Investigation of Gas and Electric Appliance Fires – 30 tested hours | 2018 |
| Residential Electricity for Fire Investigators – 16 tested hours | 2018 |

Practical Response Perspectives C.G. LLC

| | |
|---|---|
| Intermediate Crime Scene Search #2106 – 40 hours | 2017 |

Texas A&M Engineering Extension Service

| | |
|---|---|
| Interactive Motor Vehicle Fire Investigation – 16 tested hours | 2018 |
| NFPA 921 and 1033: Sword and Shield – 16 hours | 2017 |
| Death Investigation – 40 hours | 2014 |

The Houston Fire Department

| | |
|---|---|
| SLICERS Rescue and VEIS – 2 tested hours | 2018 |
| Identify and Control the Flow Path – 2 tested hours | 2018 |
| Heat Stress for Firefighters – 2 tested hours | 2017 |
| ELECTRICITY: Recognizing and Avoiding Hazards – 2 tested hours | 2017 |
| BLUE CARD Introduction and Terminology – 2 tested hours | 2017 |
| FIREHOUSE: Closing Outstanding Records – 2 tested hours | 2017 |
| Carbon Monoxide Awareness – 2 tested hours | 2017 |
| Air Management – 2 tested hours | 2017 |
| Electrical Fires – 8 tested hours | 2016 |
| HIPAA Continuing Education – 2 tested hours | 2014 |
| Courage to Be Safe Parts 1, 2, 3 – 2 tested hours | 2014 |
| Investigator Certification | 2006 |

National Highway Institute

AIMSJ0146        AIMSJ0054

Safe and Effective Use of Law Enforcement Personnel in Work Zones – 2
    hours                                                        2017

Texas State University
Terrorism Response Tactics: Active Shooter Level 1              2015

National Association of Fire Investigators
Vehicle Fire, Arson & Explosion Investigation Science and Technology
    Seminar – 32 tested hours                              2013

National Fire Academy
Electrical Aspects of Fire Investigation                   2013
Interviewing/Interrogation Techniques and Courtroom Testimony   2012

Texas Municipal Police Association
3182 State & Federal Law Update – 4 hours             2013
3841 CIT – 16 hours                                     2013
3896 Excited Delirium / Sudden In Custody Death – 4 hours     2013

Texas Commission on Fire Protection
Arson Investigator Master                                2008
Arson Investigator Advanced                           2008
Arson Investigator Intermediate                      2008
Arson Investigator Basic                                2008
Fire Investigator Basic                                 2008
Firefighter Basic                                      1995

Texas Commission on Law Enforcement Officer Standards and
Education
Basic Peace Officer                                  2008

Public Agency Training Council
Kinesic Interview & Interrogation Phase I and II – 40 hours     2007

Justice Information Management System of Harris County
D A Intake DIM                                    2007

Houston Community College Northeast
Crisis Intervention – 24 hours                         2007
Basic Peace Officer Certification – 640 hours          2007
Expandable Baton – 16 hours                        2007

AIMSJ0147               AIMSJ0055

**GREG B. GORDON, IAAI-CFI, NAFI-CFEI**
**NEFCO Fire Investigations**
1 Pickering Road-PO Box 7399
Rochester, NH 03839
(800) 675-8500

## SUMMARY OF EXPERT TESTIMONY AT TRIALS, DEPOSITIONS AND ARBITRATIONS

Lucia Oaks vs. CM Construction
Cause No. 12-12-12560
410th Judicial District Court, Montgomery County, TX
Testified in Deposition, 2013

The State of Texas vs. Rodolfo Oliva
Cause No. 1200035901010
Harris County, TX
Testified at Criminal Trial, 2009

EXHIBIT B

AIMSJ0149

AIMSJ0057



Rimkus Consulting Group, Inc.
Eight Greenway Plaza, Suite 500
Houston, TX 77046
(800) 580-3228 Telephone
(713) 623-4357 Facsimile
Certificate of Authorization No. F-1545
Certification Expiration Date September 30, 2016

*THE ORIGINAL OF THIS REPORT, SIGNED AND SEALED BY THE PROFESSIONAL WHOSE NAME APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*

# Report of Findings

### FIRE CAUSE & ORIGIN - TRAILER

### RCG File No.: 11009491

### Prepared For:

### LAW OFFICE OF LORI B. WIESE
### 1 EAST GREENWAY PLAZA, SUITE 105
### HOUSTON, TEXAS 77081

### Attention:

### MR. AL DURRELL

*[signature]*

**Gregory B. Gordon - IAAI-CFI**
**Fire Consultant**

July 25, 2016

AIMSJ0150                                          AIMSJ0058

# TABLE OF CONTENTS

I.   Introduction ........................................................................... 1

II.  Conclusions .......................................................................... 2

III. Discussion ............................................................................ 3

IV.  Basis of Report ................................................................... 10

V.   Attachments......................................................................... 11

     A. Photographs

     B. CV

July 25, 2016

AIMSJ0151                                                AIMSJ0059

## Section I
## INTRODUCTION

Rimkus Consulting Group, Inc. was retained to investigate the origin and cause of a fire that occurred on February 26, 2016 in Newton Texas. Our work to complete this assignment was performed by Mr. Gregory Gordon, IAAI- CFI. The report was technically reviewed for technical accuracy by Mr. Joseph M. Ellington, IAAI-CFI, Regional Fire Division Manager.

While performing the examination we employed the basic methodology of fire investigation and systematic approach recommended by the current edition of National Fire Protection Association 921- *Guide to Fire and Explosion Investigations*, latest edition. Additional photographs taken during our investigation but not used in the report are available on request.

This report was prepared for the exclusive use of Law Office of Lori B. Wiese, and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions, and to revise our opinions and conclusions if necessary and warranted.

AIMSJ0152

AIMSJ0060

# Section II
## CONCLUSIONS

1. The exact point of the fire's origin was not conclusively identified.

2. Neither the fire fuel ignited nor the source of the fire's ignition was conclusively identified.

3. The cause of the fire could not be determined to the threshold of certainty required by NFPA 921 – Guide for Fire & Explosion Investigation.

4. Because of this, the classification of the fire's cause is Undetermined.

AIMSJ0153

AIMSJ0061

## Section III
## DISCUSSION

On June 30, 2016, we examined the fire damaged structure located at 150 County Road 2027 in Newton, Texas (**Photograph 1**). Mr. Billy Reynolds, the owner of the property, and Mr. Wally Westbrook, an occupant, were present during the examination. In addition, legal representatives of DISH Network, Mr. Al Durrell, counsel for the installer and Mr. Johnathan Juhan, attorney for the homeowner were present. Fire Investigators and technicians from DISH Network were there for the examination as well.

During the examination, Mr. Billy Reynolds was interviewed along with other investigators and attorneys. Mr. Reynolds stated he obtained the property in 1987 and moved to its current location in 1996. He (Reynolds) described how several rooms were added onto the main house beginning in 2013 when two rooms were added to the rear of the home. These rooms were described by Mr. Reynolds as a master bedroom and day room. Mr. Reynolds advised that the combined dimensions of these rooms measured 12' by 24'. He stated that he did the work himself, including the electrical work, occasionally asking for assistance from friends and acquaintances.

In approximately 2015 Mr. Reynolds added on two more rooms to the front of the structure. These 12' x 12' rooms were described as an additional bedroom and a screened in front porch. The materials for the additions were purchased new from Lowes in Jasper.

When asked for clarification regarding who specifically did the electrical work on the home's additions, Mr. Reynolds restated that he did the electrical work himself and occasionally called a "friend" who would "coach" him over the phone when he needed assistance.

Mr. Reynolds advised there was electricity to the structure when the fire occurred, but no gas service. He explained further that there were old propane tanks and connections on the property that were not in use.

Mr. Reynolds stated that in 2008, during Hurricane Ike, a tornado damaged a portion of his roof, removing 5 to 6 pieces of tin. As with the previous modifications to the structure, he did not file an insurance claim but instead hired Mr. John Ipes, a friend to repair the home. The homeowner explained that Mr. Ipes primary occupation was "fish farming". Additional work was done on the home in 2014, that included "mud and sheetrock" work.

Mr. Reynolds stated the home had an older style antenna for television reception until he upgraded to a dish cable/satellite system provided by "Direct TV" for one month before switching to "DISH Network". According to Mr. Reynolds, the Direct TV service was in the name of his roommate, Mr. Wally Westbrook.

Mr. Reynolds estimated he had service with Direct TV from December of 2015 through January of 2016. Accordingly, there were two satellite dishes on the property that included one in the yard and one attached to the house (see photos).

Mr. Reynolds stated that he first observed the fire on the opposite wall inside the kitchen where there were no gas fueled appliances. There had been a propane fueled water heater on the west side of the house, but the propane line and tank had been removed five years earlier. A second propane tank was located along the east side of the structure and was not in use at the time of the fire, was given to Mr. Reynolds by his grandmother.

On the day of the fire, Mr. Wally Westbrook, Mr. Reynolds' roommate, and Mr. Reynolds observed Mr. Joseph Arredondo, the DISH Network installer, arrive and begin work to install the new cable/satellite service to the residence. He witnessed Mr. Arredondo cut and splice the cable for the newly installed system into the satellite dishes from Direct TV already in place in the front yard as well as the dish already

AIMSJ0155

AIMSJ0063

attached to the residence. Mr. Westbrook then observed the installer go inside of the residence to finish the installation and to hook up the receivers to two televisions inside.

Mr. Reynolds informed us that he and Mary Lou, his wife, went grocery shopping during the installation and arrived back home between 2:15 to 2:45 p.m. After returning home, and while putting groceries away, he observed the installer inside Mr. Westbrook's room in front of the TV. Shortly afterward, the couple laid down for a nap. A short time later, Mr. Reynolds stated that he woke up to a "loud boom that jarred the house".

Investigating the source of the sound, Mr. Reynolds observed fire in Mr. Westbrook's room on an opposite wall, near the northwest corner of the bedroom in the same area where the recently installed cable receiver was located.

Mr. Reynolds, his wife Mary Lou, and Annie, Wally's mom, were asleep in the house when the fire occurred. Additionally, at least eight people were identified as being on the premises. The exact locations, activities, and movements of the various occupants into and out of the residence prior to the fire could not be determined.

These persons were identified as:

- **Dakota Westbrook** - Wally Westbrook's son.

- **Charles Jones** - Mr. Reynolds' brother-in-law and neighbor who was said to be on location during the installation, but left prior to the fire.

- **Barney Simmons** - A cousin of Mr. Reynolds' who was said to be present during the installation as well as the fire.

- **Mary Lou Reynolds** – Billy Reynolds' wife who was said to be asleep inside of the structure when the fire occurred.

- **Mary Amy (Westbrook)** - Wally's wife who was said to be playing horseshoes outside when the fire occurred. Investigators were told she was present during the installation as well as the fire.

AIMSJ0156                                                                              AIMSJ0064

- **Annie** - Wally's mom who was said to be inside the residence napping when the fire occurred.

- **Billy Ray** – His relationship to Mr. Reynolds unknown. No one could confirm or deny his presence at the time the fire occurred.

- **Mark Young** – Wally's friend who lived on the property and possibly in the home. He was said to be playing horseshoes when the fire occurred. He was said to be present during the Dish installation as well as the fire.

When asked who on the property and inside the residence smoked, Mr. Westbrook stated he smoked as did Dakota, his son, Annie, his mother, Mary Amy, his wife, and Barney, his cousin.

Mr. Westbrook described the contents of his room as consisting of a double bed, a small refrigerator, two chairs and several lampstands. Additionally, there was a 14" older (tube style) television on a stand, a box fan, and the newly installed satellite equipment. Mr. Westbrook denied keeping any flammable liquids in the room; however, he did describe a small container of lighter fluid on a night stand, to the right of his bed.

Exterior examination of the property and dwelling revealed the following:

- The property was overgrown. Trees, waist high weeds and shrubs covered the fire scene. The pier and beam structure where the fire originated was a near total burn with none of the interior or exterior walls left standing (**Photograph 2**). The fire damaged remains of a passenger car was in the driveway (**Photograph 3**) and several out buildings remained standing on either side of the burned remains of the main structure.

- The wood-framed structure measured approximately 60' (north to south) by 35' (east to west) and faced in a southerly direction. None of the interior or exterior

AIMSJ0157                                                                            AIMSJ0065

walls were intact. The sheet metal roof had collapsed downward and was lying mostly within the burned remains of the structure (**Photograph 4**).

- Electrical power was supplied to the structure by means of a service drop, service raceway, and meter that, in turn, supplied power to the main breaker box located on the exterior of the structure. The burned remains of these items were recovered from the fire debris near the southwest corner of the structure (**Photograph 5**). The exact status of the breakers could not be determined due to the extent and severity of fire damage sustained by these items (**Photograph 6**).

- An empty, disconnected propane tank was located on the east side of the structure. There was no gas service to the structure at the time of the fire (**Photograph 7**).

- Two out buildings were on the property. One building was located to the northwest of the main structure and sustained moderate fire damage (**Photograph 8**). The second building, to the east of the main structure, appeared to have been used as a separate living quarters (**Photograph 9**).

- Power was supplied to this second outbuilding via Romex style conductors observed running along the ground outside this second structure before entering a window located on the first structure's west side (**Photograph 10**). The wiring, circuit breaker was installed haphazardly, with the outlets dangling below the breaker box and loosely attached to the wall. This wiring configuration was photographed and documented (**Photograph 11**). This structure sustained no obvious fire damage.

An interior examination of the main structure revealed the following:

- The structure's wooden floors were burned through exposing the pier and beam foundation in most if not all of the rooms (**Photograph 12**). The burned remains

AIMSJ0158                    AIMSJ0066

of various furniture, mattresses, and refrigerators/freezers (**Photograph 13**) were observed in the fire debris. Following the fire's movement and intensity patterns, and witness descriptions of where the fire was first observed, we entered the bedroom previously occupied by Mr. Wally Westbrook.

- The bedroom was located on the east side of the structure, approximately 35' north of the southeast corner (**Photograph 14**). The room measured approximately 10' (east to west) by 12 '(north to south). The northwest corner of the bedroom sustained the heaviest fire damage (**Photograph 15**.) The interior walls were destroyed by the fire as was most of the wooden flooring.

- The burned remains of a television as well as cable/satellite components were recovered in the debris near the northwest corner (**Photograph 16**). A small refrigerator (**Photograph 17**) was located along the west wall near a wall (electrical) outlet. In addition, the remains of a box fan (**Photograph 18**) were observed along the north wall.

- Both the west (**Photograph 19**) and north wall outlets were heavily damaged by the fire. The north wall outlet sustained the heaviest fire damage (**Photograph 20**). The refrigerator, box fan, cable/satellite boxes and the wall outlet along the north wall were collected as evidence. The items collected were retained in the possession of Mr. Johnathan Juhan, the attorney representing Mr. Reynolds (**Photograph 21**).

Because of the extent and severity of the fire's damage, a detailed evaluation of the entire structure was not possible. Based on the remaining physical evidence, we could only conclude the fire originated inside the residence (**Photograph 22**.) The exact point of the fire's origin, however, could not be conclusively identified based on the remaining available evidence.

AIMSJ0159

AIMSJ0067

Neither the first fuel ignited nor the source of the fire's ignition was conclusively identified. As a result, the cause of the fire could not be determined to the threshold of certainty required by NFPA 921.

During our examination, we observed no evidence to support the claim that the installation work performed by Associated Installation Group, or the components that they installed, caused or contributed to the fire.

Given the facts and circumstances leading up to and surrounding the fire, the age and condition of the structure and electrical system, and the undocumented location and activities of multiple persons on the premises at the time of the fire's occurrence, it is at least equally probable that the source of the fire's ignition and its cause, although undetermined, was related to the undocumented and unknown actions and activities of the occupants of the residence.

Regardless, neither the origin nor cause of the fire can be determined within any reasonably degree of certainty.

AIMSJ0160

AIMSJ0068

# Section IV
# BASIS OF REPORT

1. Examination and documentation of the fire-damaged remains of the structure on June 30, 2016.

2. Information and details provided by the homeowner and witnesses identified in the report.

3. While performing our investigation we employed the methodology of fire investigation using a systematic approach as recommended in the current edition of the National Fire Protection Association (NFPA) 921 – Guide for Fire & Explosion Investigations.

AIMSJ0161

AIMSJ0069

# Section V
## ATTACHMENTS

A. Photographs

B. CV

AIMSJ0162

AIMSJ0070

# Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection, which were not included in this report, were retained in our files and are available to you upon request.

AIMSJ0163                                    AIMSJ0071

**Photograph 1**

On June 30, 2016, we examined the fire damaged structure located at 150 County Road 2027 in Newton, Texas.



**Photograph 2**

The structure was a near total burn with none of the interior/exterior walls standing. The pier and beam foundation, and all of the contents were severely damaged by the fire.



July 25, 2016
RCG File No. 11009491

AIMSJ0164                                                                      AIMSJ0072

**Photograph 3**
The burned remains of the owner's car in the driveway.



**Photograph 4**
The sheet metal roof and its supports had collapsed into the fire debris.



July 25, 2016
RCG File No. 11009491

AIMSJ0165                                                                                           AIMSJ0073

**Photograph 5**
Power was supplied to the structure via an electrical drop, meter and breaker box located on the exterior (southwest) corner of the structure.



**Photograph 6**
The breaker box and its components were destroyed by the fire.



July 25, 2016
RCG File No. 11009491

**Photograph 7**
There was no gas service to the structure. A disconnected propane gas tank was located on the east side of the structure.



**Photograph 8**
The outbuilding located to the northwest of the structure was damaged by the fire.



July 25, 2016
RCG File No. 11009491

**Photograph 9**
The outbuilding to the east of the main residence. This building appeared to have been occupied, with power being supplied to the structure. This building was not damaged by the fire.



**Photograph 10**
Power was supplied to the building east of the main residence by Romex style electrical conductors. These conductors were run (exposed, on top of the ground) between the two structures, before entering the west window of the structure located on the east side of the main residence.



July 25, 2016
RCG File No. 11009491

**Photograph 11**
Although power was supplied to the structure on the east side of the main residence, the installation was haphazard and shoddy.



**Photograph 12**
The structures wooden floors were largely destroyed by the fire.



July 25, 2016
RCG File No. 11009491

**Photograph 13**
All of the contents of the structure were badly damaged by the fire, including the kitchen and its appliances.



**Photograph 14**
Mr. Wally Westbrooks room, where the fire was first observed.



July 25, 2016
RCG File No. 11009491

AIMSJ0170                                                    AIMSJ0078

**Photograph 15**
The available witnesses placed the fire in Mr. Westbrooks room, in the northwest corner- center of this picture. Heavy fire damage was observed in this corner.



**Photograph 16**
The burned remains of a television, as well as cable satellite equipment were observed in the northwest corner of Mr. Westbrooks room.



July 25, 2016
RCG File No. 11009491

AIMSJ0171                                                              AIMSJ0079

**Photograph 17**
Additional items were located near the northwest corner of Mr. Westbrooks room including a small refrigerator. The electrical outlet along the west wall near the refrigerator was badly damaged by the fire.



**Photograph 18**
A box fan was observed in the fire debris in Mr. Westbrooks room along the north wall.



July 25, 2016
RCG File No. 11009491

AIMSJ0172                                                                AIMSJ0080

**Photograph 19**
The fire damaged outlet, between the two kitchen appliances, located along the west wall. This outlet was located behind the small refrigerator and was heavily damaged by the fire.



**Photograph 20**
The badly burned remains of the electrical outlet located along Mr. Westbrooks north wall.



July 25, 2016
RCG File No. 11009491

AIMSJ0173                                             AIMSJ0081

**Photograph 21**
The refrigerator, box fan, television, cable satellite receivers, and (north wall) outlet from Mr. Westbrooks room were collected as evidence, transported and stored with Mr. Reynolds's attorney, Mr. Johnathan Juhan.



**Photograph 22**
Based on the remaining physical evidence, we could only conclude the fire originated inside the residence. The exact point of the fire's origin, however, could not be conclusively identified based on the remaining available evidence.



July 25, 2016
RCG File No. 11009491

# Section V
# ATTACHMENT B

## CV

July 25, 2016
RCG File No. 11009491



**RIMKUS**
CONSULTING GROUP, INC.

## GREG GORDON, NAFI-CFEI & CVFI, IAAI-CFI
### FIRE CONSULTANT

Mr. Gordon is a 1985 graduate of University of Houston with extensive training in both civil and criminal investigations. His industry knowledge spans over 25 years in public service. Mr. Gordon is experienced in both public and private sector investigations. Well qualified to testify as an expert witness, Mr. Gordon has testified in criminal matters and has completed the Interview, Interrogation and Courtroom Testimony course at the National Fire Academy in Emmitsville, Maryland.

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

Bachelor of Arts, History; University of Houston; Houston, TX
Certified Fire Investigator - International Association of Arson Investigators (IAAI)
Certified Fire and Explosion Investigator - National Association of Fire Investigators (NAFI)
Certified Vehicle Fire Investigator - National Association of Fire Investigators (NAFI)
Master Arson Investigator - Texas Commission on Fire Protection (TCFP)
Member Texas Firefighters Association (TFA)
Member Texas Municipal Police Association (TMPA)

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2011 _ Present | Fire Investigator -Rimkus Consulting Group |
| 2007 – Present | Houston Fire Department, Arson Investigator |
| 2004 – 2007 | Houston Fire Department, Engineer and Operator |
| 1994 – 2004 | Houston Fire Department, Firefighter and Paramedic |
| 1992 – 1994 | Fort Bend County EMS, Paramedic |
| 1985 – 1992 | Firefighter/EMT Tomball Fire Department |

AIMSJ0176                                                                    AIMSJ0084

**GREG GORDON - NAFI-CFEI & CVFI, IAAI-CFI**

**DETAILED PROFESSIONAL EXPERIENCE:**

**FIRE INVESTIGATOR - RIMKUS CONSULTING GROUP**      **2011- PRESENT**

**CITY OF HOUSTON – HOUSTON FIRE DEPARTMENT**      **2007 - PRESENT**

Arson Investigator

Responsible for the investigation of arson fires within Houston and surrounding Harris County. Although primarily trained as an Arson Investigator, additional duties include interviewing witnesses, conducting background checks, making arrests, performing surveillance and coordinating with local prosecutors to bring charges against known perpetrators. Is proficient in conducting interviews and interrogations as well as testifying via deposition or trial.

**CITY OF HOUSTON – HOUSTON FIRE DEPARTMENT**      **2004 – 2007**

Engineer/Operator

Responsible for the inspection, maintenance and operation of pumper and ladder trucks involved in the suppression of fire.

**CITY OF HOUSTON – HOUSTON FIRE DEPARTMENT**      **1994 – 2004**

Firefighter/Paramedic

Responsible for fighting dwelling, commercial and industrial property fires as well as vehicular fires. Also responsible for responding to medical emergency calls and evaluating and treating patients while en route to area hospitals.

**FORTBEND COUNTY EMS**      **1992 - 1994**

Paramedic

**TOMBALL FIRE DEPARTMENT**      **1985 – 1992**

Firefighter/EMT

**ADDITIONAL TRAINING:**

| | |
|---|---|
| HIPAA Continuing Education  9/27/2014 | HFD Arson Bureau Training |
| Computer Operations (BATS) 10/23/2013 | HFD Arson Bureau Training |
| Vehicle Fire, Arson & Explosion Investigation Science 10/3/2013 & Technology Seminar | Certified as CFEI and CVFI Fire Investigator |
| Electrical Aspects of Fire Investigations 08/11-08/16-2013 | FEMA National Fire Academy |
| Crisis Intervention and Treatment 02/22/2013 | TMPA training course- HAB |
| Excited Delirium/ Sudden in Custody Death 02/22/2013 | TMPA training course- HAB |

AIMSJ0177      AIMSJ0085

## GREG GORDON - NAFI-CFEI & CVFI, IAAI-CFI

| | |
|---|---|
| State and Federal Law Update 02/19/2013 | TMPA training course - HAB |
| Interview, Interrogation and Courtroom Testimony Course, 10/09-10/19-2012 | FEMA National Fire Academy |
| Motive, Means and Opportunity: Determining Responsibility in an Arson Case, 06/21/2012 | IAAI-CFI Training Program |
| Origin and Cause Report Writing, 06/15/2012 | IAAI-CFI Training Program |
| Fire Investigations Update, 05/16/2012 | HFD Arson Bureau Training |
| Effective Investigation and Testimony, 04/24/2012 | IAAI-CFI Training Program |
| Ethics and the Fire Investigator, 04/15/2012 | IAAI-CFI Training Program |
| "Critical Thinking Solves Cases", 04/01/2012 | IAAI-CFI Training Program |
| MagneTek, A Case Study in the Daubert Challenge, 03/20/2012 | IAAI-CFI Training Program |
| Explosion Dynamics, 01/04/2012 | IAAI-CFI Training Program |
| Arson Investigations, Part II, 01/04/2012 | HFD Arson Bureau Training |
| Arson Investigations, Part I, 01/    03/2012 | HFD Arson Bureau Training |
| Investigating Motor Vehicle Fires, 01/03/2012 | IAAI-CFI Training Program |
| Cultural Awareness Seminar, 08/06/2009 | HFD Arson Bureau Training |
| Cultural Awareness Seminar, 07/28/2009 | HFD Arson Bureau Training |
| Arson Investigations, 07/20/2009 | HFD Arson Bureau Training |
| Juvenile Offenders Seminar, 06/23/2009 | HFD Arson Bureau Training |
| Health, Physical Fitness & Stress, 06/02/2009 | HFD Arson Bureau Training |
| General Report Writing Seminar, 01/27/2009 | HFD Arson Bureau Training |
| Photography II, 01/27/2009 | HFD Arson Bureau Training |
| Photography I, 01/20/2009 | HFD Arson Bureau Training |
| Law, 12/02/2008 | HFD Arson Bureau Training |
| Sexual Harassment Recognition, 08/12/2008 | HFD Arson Bureau Training |
| Civil Law, 08/12/2008 | HFD Arson Bureau Training |
| Patrol Tactics, 08/11/2008 | Houston Police Academy |
| Computer Operations, 07/09/2008 | HFD Arson Bureau Training |

AIMSJ0178                    AIMSJ0086

## GREG GORDON - NAFI-CFEI & CVFI, IAAI-CFI

Computer Operations, 03/31/2008 — HFD Arson Bureau Training

Proficiency, 03/11/2008 — HFD Arson Bureau Training

Communications/Operations, 12/03/2007 — HFD Arson Bureau Training

9/11, 12/03/2007 — HFD Arson Bureau Training

Criminal Investigation, 12/03/2007 — HFD Arson Bureau Training

Management Supervision, 12/03/2007 — HFD Arson Bureau Training

Terrorism and Special Threats, 12/03/2007 — HFD Arson Bureau Training

Collection and Preservation of Evidence, 12/03/2007 — HFD Arson Bureau Training

Technical Training, 10/17/2007 — Harris County Sheriff's Academy

Legal Update, 09/10/2007 — HFD Arson Bureau Training

Traffic Control Seminar, I and II, 04/20/2007 — Houston Police Academy

Peace Officer Field Training Course, 03/20/2007 — HFD Arson Bureau Training

Technical/Specialized Operations, 01/23/2007 — Houston Police Academy

Basic Peace Officer Training, 01/22/2007 — HCC Police Academy

Crisis Intervention Training, 01/22/2007 — HCC Police Academy

AIMSJ0179                    AIMSJ0087

# EXHIBIT C

AIMSJ0180

AIMSJ0088

# Newton Volunteer Fire Department

P.O. Box 982   Newton, Texas 75966
409-379-8134

## Incident Report

Date 2/26/12 Notified by: [✓] Pager [ ] Phone [ ] Other: Time 1623 AM/PM

Time Arrived 634 Dismissed: 1845 Hours 2 Miles Traveled: 14

Response Type:
[ ] Wild land Fire [ ] Vehicle [ ] Haz-Mat [✓] Structural Fire [ ] Medical [ ] Search & Rescue [ ] Other (explain)

Main Cause:
[ ] Lighting [ ] Campfire [ ] Smoking [ ] Debris Burning [ ] Railroad [ ] Equipment Use  x unk cause

Fire Discovered By: Name  Billy Reynolds   409-224-0291
Address: 150 CR 2029 Newton

Ownership:
[ ] Private [ ] Timber Company [ ] Other (explain) _____

Owner: Billy Reynolds      409-298-6294
Owners Address: 150 CR 2029  Newton, TX

Insurance Information:
Agency: _____ NO _____ Policy # _____   yes

Forcible Entry [ ] Door [ ] Window [ ] Roof [ ] Other  } N/A
Ventilation    [ ] Door [ ] Window [ ] Roof [ ] Other

Extinguished By [ ] Booster [ ] Extinguisher [ ] Pumper [ ] Other _____

No. Hydrants Used 2 Hours Pump Worked 1/2 No. Of Lines Used 7
No. Units 12 No. Fireman 25 Injuries 3

Was this fire in your primary response area? [ ] YES [ ] NO

Total number of department / agencies responding: _____

Was Texas Forest Service involved in this response? [ ] YES [ ] NO
COMMENTS: Owner states that Dish TV box was on fire. msp
Newton 6 trucks - 14 people  Bonwier Laparle 4 trucks
First Creek  2 trucks  15 people
Plus fire heater brought to short fire

SPECIAL NOTES FIRE SCENE OPERATIONS:
3 injuries - Billy Reynolds Maghen Reynolds Anne Washburd
Transport by Ambulance
House total loss

Incident No. 26-1

_Chief Hoh Kelly_
SIGNATURE OF OFFICER IN CHARGE
        Capt Milanie Fowler

# Exhibit 3

AIMSJ0182

AIMSJ0090

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| **BILLY REYNOLDS AND MARY REYNOLDS** | § | |
| | § | **C.A. NO. 1:18-cv-00065-MAC** |
| **V.** | § | |
| | § | **JURY DEMAND** |
| **DISH NETWORK** | § | **AFFIDAVIT SUPPORTING** |
| | § | **MOTION FOR SUMMARY** |
| **V.** | § | **JUDGMENT** |
| | § | |
| **ASSOCIATED INSTALLATION GROUP, INC.** | § | |

## AFFIDAVIT

My name is Danny Parker. I am the owner of Associated Installation Group, Inc. ("Associated").

I am competent to make this affidavit. I have never been convicted of a felony or a crime of moral turpitude. My statements are based on personal knowledge.

I have owned Associated since its formation. I have worked in the satellite dish installation business for 18 years.

Associated installed the Dish Network satellite in a location on the Reynolds' house that permitted alignment with the satellites carrying the Dish Network signals. The Dish satellite system installed at the Reynold's property used, in part, wiring that had been installed by a prior satellite provider, Direct TV, which is a common practice in the satellite installation industry. Associated installed a Dish satellite on the eaves of the Reynolds' house by using a "J" hook. The satellite dish ran to a "splitter" that allowed the satellite signal to be split and serve two receivers on the Reynolds' property. None of the wiring used by Associated to install the satellite system on the Reynolds' property carried an electrical charge. The two receivers installed on the Reynolds' property were new and plugged into a standard 110-volt outlet. Dish supplied the receivers and the satellite dish. The two receivers were plugged in to existing electrical outlets on the Reynolds' property and connected by coaxial cable to existing non-energized satellite TV outlets. Associated simply plugged in the receivers, connected the coaxial cable, aligned the satellite dish, and adjusted the receivers to obtain the satellite signals for the programming ordered for the Reynolds' property.

In 18 years of installing satellite television systems, I have never experienced an explosion from the installation of a satellite system. I have no knowledge of any of the materials and products used in the installation of satellite systems presenting an explosion risk. I have never experienced

AIMSJ0183                    AIMSJ0091

a fire risk from the installation materials used to install satellite systems. Associated does not design, manufacture, or prepare the warnings for the satellite equipment it installed at the Reynolds' property. Associated did not modify or alter in any way the equipment it installed at the Reynolds' property or the warnings given with the equipment. Associated supplied the warnings that come with the Dish Network equipment to the Reynolds, when Associated installed the equipment.

I am the custodian or otherwise qualified person of the documents attached to and incorporated in this affidavit. The attached documents are kept by Associated in the regular course of business, and it was the regular course of business of Associated for an employee or representative of BBA, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Signed this _____ day of _____, 2019.


_____
Danny Parker


SWORN TO and SUBSCRIBED before me by Danny Parker on the _____ day of _____,
2019.


_____
Notary Public in and for the
State of Texas

| | | |
|---|---|---|
| **BILLY REYNOLDS AND MARY REYNOLDS** | § | |
| | § | **C.A. NO. 1:18-cv-00065-MAC** |
| **V.** | § | |
| | § | **JURY DEMAND** |
| **DISH NETWORK** | § | **AFFIDAVIT SUPPORTING** |
| | § | **MOTION FOR SUMMARY** |
| **V.** | § | **JUDGMENT** |
| | § | |
| **ASSOCIATED INSTALLATION GROUP, INC.** | § | |

## AFFIDAVIT

My name is Danny Parker. I am the owner of Associated Installation Group, Inc. ("Associated").

I am competent to make this affidavit. I have never been convicted of a felony or a crime of moral turpitude. My statements are based on personal knowledge.

I have owned Associated since its formation. I have worked in the satellite dish installation business for 18 years.

Associated installed the Dish Network satellite in a location on the Reynolds' house that permitted alignment with the satellites carrying the Dish Network signals. The Dish satellite system installed at the Reynold's property used, in part, wiring that had been installed by a prior satellite provider, Direct TV, which is a common practice in the satellite installation industry. Associated installed a Dish satellite on the eaves of the Reynolds' house by using a "J" hook. The satellite dish ran to a "splitter" that allowed the satellite signal to be split and serve two receivers on the Reynolds' property. None of the wiring used by Associated to install the satellite system on the Reynolds' property carried an electrical charge. The two receivers installed on the Reynolds' property were new and plugged into a standard 110-volt outlet. Dish supplied the receivers and the satellite dish. The two receivers were plugged in to existing electrical outlets on the Reynolds' property and connected by coaxial cable to existing non-energized satellite TV outlets. Associated simply plugged in the receivers, connected the coaxial cable, aligned the satellite dish, and adjusted the receivers to obtain the satellite signals for the programming ordered for the Reynolds' property.

In 18 years of installing satellite television systems, I have never experienced an explosion from the installation of a satellite system. I have no knowledge of any of the materials and products used in the installation of satellite systems presenting an explosion risk. I have

AIMSJ0185

never experienced a fire risk from the installation materials used to install satellite systems. Associated does not design, manufacture, or prepare the warnings for the satellite equipment it installed at the Reynolds' property. Associated did not modify or alter in any way the equipment it installed at the Reynolds' property or the warnings given with the equipment. Associated supplied the warnings that come with the Dish Network equipment to the Reynolds, when Associated installed the equipment.

*Associated*

I am the custodian or otherwise qualified person of the documents attached to and incorporated in this affidavit. The attached documents are kept by Associated in the regular course of business, and it was the regular course of business of Associated for an employee or representative of ~~BBA~~, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Signed this _26_ day of _February_ , 2019.



Danny Parker

SWORN TO and SUBSCRIBED before me by Danny Parker on the _26_ day of _February_ , 2019.

Notary Public in and for the
State of Texas

LUIS A HERNANDEZ
Notary ID # 129168327
My Commission Expires
November 8, 2020

AIMSJ0186

# Limited Warranty

This Limited Warranty is a legal document. Keep it in a safe place. Remember to retain your Bill of Sale for warranty service! Any items returned without a copy of the Proof of Purchase will be considered out of warranty.

## What the Warranty Covers

This warranty extends only to the original user of the equipment and is limited to the purchase price of each part. DISH Network L.L.C. and its affiliated companies ("DISH") warrant this system against defects in materials or workmanship as follows:

- **Labor:** For a period of one (1) year from the original date of purchase, if DISH determines that the equipment is defective subject to the limitations of this warranty, it will be replaced at no charge for labor. DISH warrants any such work done against defects in materials or workmanship for the remaining portion of the original warranty period.

- **Parts:** For a period of one (1) year from the original date of purchase, DISH will supply, at no charge, new or remanufactured parts in exchange for parts determined to be defective subject to the limitations of this warranty. DISH warrants any such replacement parts against defects in materials or workmanship for the remaining part of the original warranty period. Note: "Parts" means items included in this package, which may include the satellite dish assembly, receiver, LNBF, remote control, power supply, or dish mounting hardware. It does not include other parts purchased separately.

## What the Warranty Does Not Cover

This warranty does not cover installation of the system. If applicable, such installation will be warrantied under a separate installation agreement.

This warranty does not cover consumer instruction, physical setup or adjustment of any consumer electronic devices, remote control batteries, signal reception problems, loss of use of the system, or unused programming charges due to system malfunction.

This warranty does not cover cosmetic damage, damage due to lightning, electrical or telephone line surges, battery leakage, fire, flood, or other acts of Nature, accident, misuse, abuse, repair or alteration by other than authorized factory service, use of accessories not recommended by the receiver manufacturer, negligence, commercial or institutional use, or improper or neglected maintenance.

This warranty does not cover equipment sold AS IS or WITH ALL FAULTS, shipping and handling, removal or reinstallation, shipping damage if the equipment was not packed and shipped in the manner prescribed, nor equipment purchased, serviced, or operated outside the continental United States of America.

mydish.com/chat • 1-800-333-DISH (3474)                                               | 6

AIMSJ0187

# Limited Warranty (cont.)

## Legal Limitations

REPLACEMENT AS PROVIDED UNDER THIS WARRANTY IS YOUR EXCLUSIVE REMEDY. DISH NETWORK SHALL NOT BE HELD LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR BREACH OF ANY EXPRESSED OR IMPLIED WARRANTY ON THIS SYSTEM, NOR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM THE USE OF, OR INABILITY TO USE, THIS SYSTEM. SOME STATES MAY LIMIT OR EXCLUDE THE FOREGOING LIMITATION, SO THE ABOVE EXCLUSION OR LIMITATION MAY NOT APPLY TO YOU. EXCEPT TO THE EXTENT PROHIBITED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES SHALL DISH NETWORK'S LIABILITY, IF ANY, EXCEED THE PURCHASE PRICE PAID FOR THIS SYSTEM. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON THIS SYSTEM IS LIMITED IN DURATION TO THE PERIOD OF THIS WARRANTY. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG A STATUTORY OR IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. DISH NETWORK RESERVES THE RIGHT TO REFUSE TO HONOR THIS WARRANTY IF DISH NETWORK DETERMINES ANY OF THE ABOVE EXCEPTIONS TO HAVE CAUSED THIS SYSTEM. NOT TO HAVE PERFORMED PROPERLY. THIS WARRANTY SHALL BE VOID IF ANY FACTORY-APPLIED IDENTIFICATION MARK, INCLUDING BUT NOT LIMITED TO SERIAL OR CONDITIONAL ACCESS NUMBERS, HAS BEEN ALTERED OR REMOVED. THIS WARRANTY SHALL ALSO BE VOID IF THE RECEIVER HAS BEEN OPENED BY AN UNAUTHORIZED PERSON.

## If You Need Assistance

1. Call the Customer Service Center at 1-800-333-DISH (3474). Have the date of purchase and either your customer account number, the receiver conditional access number, or the receiver model number ready. Display the System Info screen to find these numbers.

2. A Customer Service representative will assist you. If the Representative determines that you should return any equipment, you will be directed to call a Return Authorization representative. Before shipping any equipment, you must talk to a Return Authorization representative and must obtain a Return Authorization (RA) number.

3. You will be given the appropriate address for which to return your equipment. Whether under warranty or not, you will be responsible for the cost of shipping back the defective equipment. For faster service, see the Advance Exchange Program on the next page.

4. Returned equipment must be packaged properly, using either the original shipping materials or the packaging in which the replacement equipment is shipped. Include a copy of the Bill of Sale. Any items returned without a copy of the Proof of Purchase will be considered out of warranty. Follow the instructions given to you by the Customer Service representative.

5. Write the RA number in large, clearly visible characters on the outside of the shipping box that you use to return the equipment. To avoid confusion and misunderstandings, shipments without an RA number clearly visible on the outside of the box will be returned to you at your expense.

AIMSJ0188

never experienced a fire risk from the installation materials used to install satellite systems. Associated does not design, manufacture, or prepare the warnings for the satellite equipment it installed at the Reynolds' property. Associated did not modify or alter in any way the equipment it installed at the Reynolds' property or the warnings given with the equipment. Associated supplied the warnings that come with the Dish Network equipment to the Reynolds, when Associated installed the equipment.

I am the custodian or otherwise qualified person of the documents attached to and incorporated in this affidavit. The attached documents are kept by Associated in the regular course of business, and it was the regular course of business of Associated for an employee or representative of ~~BBA~~ Associated, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Signed this _26_ day of _February_, 2019.



Danny Parker

SWORN TO and SUBSCRIBED before me by Danny Parker on the _26_ day of _February_, 2019.

Notary Public in and for the
State of Texas

LUIS A HERNANDEZ
Notary ID # 129168327
My Commission Expires
November 8, 2020

AIMSJ0189

# Limited Warranty

This Limited Warranty is a legal document. Keep it in a safe place. Remember to retain your Bill of Sale for warranty service! Any items returned without a copy of the Proof of Purchase will be considered out of warranty.

## What the Warranty Covers

This warranty extends only to the original user of the equipment and is limited to the purchase price of each part. DISH Network L.L.C. and its affiliated companies ("DISH") warrant this system against defects in materials or workmanship as follows:

- **Labor:** For a period of one (1) year from the original date of purchase, if DISH determines that the equipment is defective subject to the limitations of this warranty, it will be replaced at no charge for labor. DISH warrants any such work done against defects in materials or workmanship for the remaining portion of the original warranty period.

- **Parts:** For a period of one (1) year from the original date of purchase, DISH will supply, at no charge, new or remanufactured parts in exchange for parts determined to be defective subject to the limitations of this warranty. DISH warrants any such replacement parts against defects in materials or workmanship for the remaining part of the original warranty period. Note: "Parts" means items included in this package, which may include the satellite dish assembly, receiver, LNBF, remote control, power supply, or dish mounting hardware. It does not include other parts purchased separately.

## What the Warranty Does Not Cover

This warranty does not cover installation of the system. If applicable, such installation will be warrantied under a separate installation agreement.

This warranty does not cover consumer instruction, physical setup or adjustment of any consumer electronic devices, remote control batteries, signal reception problems, loss of use of the system, or unused programming charges due to system malfunction.

This warranty does not cover cosmetic damage, damage due to lightning, electrical or telephone line surges, battery leakage, fire, flood, or other acts of Nature, accident, misuse, abuse, repair or alteration by other than authorized factory service, use of accessories not recommended by the receiver manufacturer, negligence, commercial or institutional use, or improper or neglected maintenance.

This warranty does not cover equipment sold AS IS or WITH ALL FAULTS, shipping and handling, removal or reinstallation, shipping damage if the equipment was not packed and shipped in the manner prescribed, nor equipment purchased, serviced, or operated outside the continental United States of America.

mydish.com/chat • 1-800-333-DISH (3474)                                    | 6

AIMSJ0190

# Limited Warranty (cont.)

### Legal Limitations

REPLACEMENT AS PROVIDED UNDER THIS WARRANTY IS YOUR EXCLUSIVE REMEDY. DISH NETWORK SHALL NOT BE HELD LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR BREACH OF ANY EXPRESSED OR IMPLIED WARRANTY ON THIS SYSTEM, NOR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM THE USE OF, OR INABILITY TO USE, THIS SYSTEM. SOME STATES MAY LIMIT OR EXCLUDE THE FOREGOING LIMITATION, SO THE ABOVE EXCLUSION OR LIMITATION MAY NOT APPLY TO YOU. EXCEPT TO THE EXTENT PROHIBITED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES SHALL DISH NETWORK'S LIABILITY, IF ANY, EXCEED THE PURCHASE PRICE PAID FOR THIS SYSTEM. ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON THIS SYSTEM IS LIMITED IN DURATION TO THE PERIOD OF THIS WARRANTY. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG A STATUTORY OR IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. DISH NETWORK RESERVES THE RIGHT TO REFUSE TO HONOR THIS WARRANTY IF DISH NETWORK DETERMINES ANY OF THE ABOVE EXCEPTIONS TO HAVE CAUSED THIS SYSTEM NOT TO HAVE PERFORMED PROPERLY. THIS WARRANTY SHALL BE VOID IF ANY FACTORY-APPLIED IDENTIFICATION MARK, INCLUDING BUT NOT LIMITED TO SERIAL OR CONDITIONAL ACCESS NUMBERS, HAS BEEN ALTERED OR REMOVED. THIS WARRANTY SHALL ALSO BE VOID IF THE RECEIVER HAS BEEN OPENED BY AN UNAUTHORIZED PERSON.

### If You Need Assistance

1. Call the Customer Service Center at 1-800-333-DISH (3474). Have the date of purchase and either your customer account number, the receiver conditional access number, or the receiver model number ready. Display the System Info screen to find these numbers.

2. A Customer Service representative will assist you. If the Representative determines that you should return any equipment, you will be directed to call a Return Authorization representative. Before shipping any equipment, you must talk to a Return Authorization representative and must obtain a Return Authorization (RA) number.

3. You will be given the appropriate address for which to return your equipment. Whether under warranty or not, you will be responsible for the cost of shipping back the defective equipment. For faster service, see the Advance Exchange Program on the next page.

4. Returned equipment must be packaged properly, using either the original shipping materials or the packaging in which the replacement equipment is shipped. Include a copy of the Bill of Sale. Any items returned without a copy of the Proof of Purchase will be considered out of warranty. Follow the instructions given to you by the Customer Service representative.

5. Write the RA number in large, clearly visible characters on the outside of the shipping box that you use to return the equipment. To avoid confusion and misunderstandings, shipments without an RA number clearly visible on the outside of the box will be returned to you at your expense.

AIMSJ0191